IN THE COMMON PLEAS COURT FOR BUTLER COUNTY, OHIO
CIVIL DIVISION

| | | |
|---|---|---|
| MATTHEW B. ROMERO<br>604 S. Main Street<br>Middletown, Ohio 45044 | : <br> : <br> : | CASE NO.: |
| Plaintiff, | : | |
| vs. | : | |
| CITY OF MIDDLETOWN<br>1 Donham Plaza<br>Middletown, Ohio 45042 | : <br> : <br> : | Judge: |
| and | : | |
| DOUGLAS ADKINS<br>1 Donham Plaza<br>Middletown, Ohio 45042 | : <br> : <br> : | |
| and | : | |
| SCOTT BELCHER<br>1 Donham Plaza<br>Middletown, Ohio 45042 | : <br> : <br> : | **JURY DEMAND ENDORSED<br>HEREON** |
| and | : | |
| MARK CLEMONS<br>1 Donham Plaza<br>Middletown, Ohio 45042 | : <br> : <br> : | |
| and | : | |
| SCOTT TADYCH<br>1 Donham Plaza<br>Middletown, Ohio 45042 | : <br> : <br> : | |
| Defendants. | : | |

FILED BUTLER CO.
COURT OF COMMON PLEAS
MAR 27 2019
MARY L. SWAIN
CLERK OF COURTS

**COMPLAINT - OTHER CIVIL**

**REFILING OF CASE NO.: CV2017 04 0741
JUDGE CHARLES L. PATER**

Now comes the plaintiff, Matthew B. Romero ("Mr. Romero"), and for his complaint against the Defendants, City of Middletown ("Middletown"), Douglas Adkins, Scott Belcher, Mark Clemons, and Scott Tadych, and sets forth the following allegations, to-wit:

## PARTIES, JURISDICTION, AND VENUE

1. Mr. Romero is a resident of Butler County, Ohio, and he worked for Middletown in its Water Treatment Division. As a Middletown employee, Mr. Romero was a public employee within the meaning of R.C. § 145.01(A)(1).

2. Defendant Middletown is a chartered municipal corporation incorporated and existing under the laws of the State of Ohio, and is a public employee within the meaning of R.C. § 145.01(D).

3. Defendant Douglas Adkins is the Middletown Manager, and as the Middletown Manager, he is authorized to act on behalf of Middletown, creates and implements Middletown policy, establishes Middletown usage and custom, and has final decision and policy making authority, including the termination of Middletown employees.

4. Defendant Scott Belcher is Middletown's Water Treatment Manager, and as the Water Treatment Manager, he is authorized to act on behalf of Middletown, creates and implements Middletown policy and establishes Middletown usage and custom.

5. Defendant Mark Clemons is Middletown's Process Control Supervisor, and as the Process Control Supervisor, he is authorized to act on behalf of Middletown, creates and implements Middletown policy and establishes Middletown usage and custom.

6. Defendant Scott Tadych is Middletown's Public Works Director, and as the Public Works Director, he is authorized to act on behalf of Middletown, creates and implements Middletown policy and establishes Middletown usage and custom.

7. Jurisdiction of this Court is predicated on R.C. § 2305.01, 42 U.S.C. § 1983, and 42 U.S.C. § 1988 providing for subject matter jurisdiction, and venue is proper pursuant to Civil Rules 3(B)(3), 3(B)(6), and 3(B)(7).

## BASIS OF DISPUTE

8. Mr. Romero worked at Middletown's Water Treatment Division as a Process Control Supervisor for five years, and five years before that he was a Plant Operator. He retired in March 2014 pursuant to Ohio's Public Employees Retirement System. Mr. Romero is certified by the Ohio Environmental Protection Agency ("OEPA") as a Class III water supply operator.

9. In June 2014, Mr. Romero accepted part time employment in Middletown's Water Treatment Division as an Assistant Treatment Plant Lab Analyst ("Assistant Lab Analyst"). As an Assistant Lab Analyst, Mr. Romero's job responsibilities included performing chemical and bacteriological analyses of municipal drinking water samples, quality control procedures; collecting samples; operating and maintaining sampling, analytical procedures, and equipment, customer service, and water quality concerns; and related work as required by supervisor.

10. As Mr. Romero performed his duties, he was required to traverse the water treatment plant. In doing so he was confronted with multiple incidents of mismanagement, and unsafe, unlawful, and otherwise improper operation and conditions in the water treatment plant. For

example, in the spring of 2015, Mr. Romano observed that a warning light on the liquid $CO_2$ tank was activated. $CO_2$ is used in the water treatment process to adjust the pH of the water. Although Mr. Romero duties as an Assistant Lab Technician did not involve the $CO_2$ tank, he spoke to a Plant Operator and was told that the warning light had been illuminated for approximately two weeks.

11. After speaking to the Plant Operator, Mr. Romero examined the $CO_2$ tank and discovered that the pressure gauge was broken. Checking log records, Mr. Romero learned that Plant Operators had been inaccurately completing internal control charts by repeatedly recording the broken gauge reading, leading to a critically low level of liquid $CO_2$ and the potential rupture of the 40 ton tank, risking serious injury and death to Plant Operators and anyone else in the vicinity. After discovering that the pressure gauge was broken, Mr. Romero immediately shut down the tank and took other corrective action. Thereafter Mr. Romero discussed his concerns as to the condition of the $CO_2$ tank with Mr. Belcher, Mr. Clemons and Mr. Tadych.

12. By early 2016, Mr. Romero was observing and reporting unsafe, unlawful, and otherwise improper conditions unrelated to his job responsibilities to Mr. Belcher and/or Mr. Clemons at least weekly. In May 2016, a Plant Operator told Mr. Romero that management was low on lime and Middletown could potentially deplete its lime supply before the next delivery. Failure to maintain an adequate lime supply would violate Middletown's OEPA permit to operate a lime softening treatment plant. The Plant Operator spoke to Mr. Romero because of Mr. Romero's knowledge and experience as a former Process Control Supervisor. Mr. Romero ordered additional lime and emailed Mr. Belcher and Mr. Clemons that the lime supply had nearly been depleted and that he had placed an order for an emergency delivery.

13. In response, Mr. Clemons emailed Mr. Romero and told him that he had already ordered extra lime deliveries. Mr. Romero knew that this statement was untrue, and he sent an email to Mr. Belcher telling him that allowing the lime supply to get so low was simple negligence. After Mr. Clemens falsely asserted that the lime supply issue had been addressed, he became angry that Mr. Romero had reported the depleted lime supply. Mr. Belcher also told Mr. Romero that running out of lime "wasn't a big deal." Subsequently, Mr. Clemons admitted that he had not placed the lime order and only then did he schedule additional lime deliveries.

14. A few weeks after the lime incident, Mr. Romero observed fluctuations in tests for water pH and alkalinity that were indicating excessive pH and alkalinity levels. Mr. Romero discussed his concerns with the Plant Operators and realized that they were uninformed about important aspects of water quality involving pH levels, water hardness, and alkalinity, as well as appropriate treatment measures that needed to be taken to address these issues. This lack of Plant Operator knowledge and understanding was resulting in the waste of plant supplies and resources used to control water quality and was placing the public health at risk.

15. Consequently, Mr. Romero reported to Mr. Belcher and Mr. Clemons that the Plant Operators were not being properly trained to know and understand how to safely and efficiently operate the water treatment facility. Since operator training and water treatment procedures were not included in Mr. Romero's job responsibilities, he reported his observations and concerns to Mr. Belcher and Mr. Clemons speaking as private citizen on matters of public concern. For example, Mr. Romero reported that Plant Operators were not taking elementary precautions that are necessary to prevent the formation of disinfectant by-products, such as the

routine cleaning of the chlorine storage tanks. The resulting disinfectant by-products include the formation of haloacetic acids, which have been linked to certain cancers. Despite these implications, Mr. Belcher and Mr. Clemons did not seem surprised by Mr. Romero's report and told him that plant operations would improve going forward.

16. In the summer of 2016, Middletown conducted a routine lead and copper water survey at various residences. Mr. Romero was assigned to prepare sample collections and take phone calls from residents inquiring about the survey test results. Mr. Romero also assisted in conducting the lead and copper water tests. Mr. Romero later learned that test results for certain samples confirmed that the pH of the finished water was outside the advised range as provided for in the Secondary Drinking Water Standards issued by the Environmental Protection Agency, placing water quality at increased risk.

17. Mr. Romero spoke to Mr. Belcher and Mr. Clemons about the impact of fluctuating pH results and low chlorine residuals on Middletown's 4 Log reports, which recorded disinfection contact time for the water processed through the treatment plant. Mr. Belcher and Mr. Clemons told Mr. Romero that the pH results would not affect the data and calculations recorded in the 4 Log reports. However, Mr. Romero knew this was wrong because pH results are critical to analysis of water quality recorded in the 4 Log report, and he was also concerned about whether the procedure Middletown was using to gather water treatment disinfectant effectiveness was in compliance with OEPA guidelines for the collection of data recorded in the 4 Log reports.

18. Mr. Romero's concerns about the importance of high pH and alkalinity test results were not merely theoretical, as there are potentially serious adverse health consequences. Allowing

high pH levels in the water supply encourages the creation of trihalomethanes, which have been linked to adverse reproductive outcomes and certain cancers. High pH levels can also reduce the effectiveness of chlorine as a disinfectant used to control biological contamination. Allowing high alkalinity levels can impair the efficacy of anti-corrosive agents used to prevent the release of lead and arsenic into the drinking water.

19. By the summer of 2016, Mr. Romero was aware that Mr. Belcher and Mr. Clemons were becoming increasingly hostile towards him in response to his reports of unsafe or improper plant conditions and operations. Mr. Romero's work schedule was arbitrarily reduced from thirty hours a week to twenty-one hours per week without explanation. Mr. Romero was told that he was to limit his activities to his job responsibilities and that he was not permitted to monitor operations, check the lime level or do rounds at the plant. Mr. Romero also noticed a change in the attitude of Plant Operators towards him, and that Plant Operators had become reluctant engage him in conversation and to ask him questions about plant operations.

20. On June 30, 2016, Mr. Romero emailed the OEPA Drinking Water Division, requesting guidance in calculating the disinfection contact time factor recorded in the 4 Log reports, and he spoke to Jeff Davidson at the OEPA. Mr. Romero asked about whether Middletown's test procedure properly complied with OEPA's guidance document, whether the current guidance document was wrong, and whether other water treatment plants were being directed to collect data differently. Mr. Romero discussed with Mr. Davidson the parameters of the calculations used in the 4 Log reports. Mr. Davidson discussed the OEPA's expectations in this regard and indicated that Middletown was incorrectly preparing the 4 Log reports.

21. On July 5, 2016, Mr. Romero emailed Mr. Belcher about his call to Mr. Davidson at the OEPA, stating that "I called the southwest OEPA office and spoke with the person in charge of the drinking water section, since Dan was on extended leave. I will leave it to you to make further adjustments, as the way you are doing it now may be incorrect." Mr. Belcher never asked Mr. Romero about how Middletown might be in violation of OEPA's compliance guidelines and seemed unconcerned about potential OEPA violations.

22. On or about August 3, 2016, Mr. Romero received a call from a resident asking about the lead and copper survey results, which indicated to Mr. Romero that the resident had not received notification of the results. As a result, Mr. Romero realized that Middletown had not sent the federally mandated notifications, and Middletown had already missed the deadline to send these notifications. Pursuant to 40 C.F.R. § 141.85, Middletown had thirty days from receipt of the lead and copper survey test results to notify residents whose water had been tested of the test results. Mr. Romero sent Mr. Clemons an email stating that Middletown only had a thirty day window to send the required notification.

23. That same day, Mr. Romero met with Mr. Tadych and discussed plant operation and safety concerns that he had been reporting to Mr. Clemons and Mr. Belcher, including the late notification to residents of the lead and copper survey results. Mr. Romero also reported his concerns about wells 16 and 17, which had tested for excessive levels of arsenic contamination, as well as additional issues, violations and hazards involving dust suppression, the secondary basin malfunction, reservoir operations, and Middletown's failure to disclose an inoperable lime slaker to the OEPA. Mr. Romero reported that Mr. Clemons and Mr. Belcher seemed to be

absent from the water treatment plant for long periods of time, and that their absences were impacting Plant Operator performance. None of the issues reported by Mr. Romero to Mr. Tadych were involved in Mr. Romero's job responsibilities, and he spoke to Mr. Tadych as a private citizen.

24. On August 4, 2016, Mr. Romero met with Mr. Belcher and Mr. Clemons. Mr. Romero quickly realized that the meeting had been called primarily so that Mr. Belcher could interrogate him about why he had contacted the OEPA. Mr. Romero explained that he had called the OEPA for guidance on the 4 Log removal and to reconcile Middletown's procedures in preparing the 4 Log report with OEPA directions. Mr. Belcher seemed to be unable to accept Mr. Romero's explanation. Mr. Romero was told that talking to the OEPA was not part of his job duties, and he was instructed to follow the chain of command. Mr. Romero could see that Mr. Belcher and Mr. Clemons were clearly angry that he had called the OEPA, stating he was told that he should have notified Mr. Clemons and Mr. Tadych to obtain any information he needed regarding a guidance document before he called the OEPA.

25. Shortly after the August 4, 2016 meeting, Mr. Belcher sent Mr. Romero a Memorandum concerning the instructions Mr. Romero had received during the meeting. Mr. Romero was told that the purpose of the Memorandum was to clarify Middletown policy. The Memorandum stated that Mr. Romero had a right to call OEPA to report a violation or non-compliance of OEPA regulations by Middletown. However, Mr. Romero was additionally instructed that Middletown policy prohibited him from calling the OEPA concerning the Middletown 4 Log report, as that exceeded the scope of his job duties as an Assistant Lab Technician.

26. On August 15, 2016, Mr. Romero attended a meeting with Mr. Tadych, Mr. Belcher, and Mr. Clemons. This meeting was in response to Mr. Romero's request to discuss the instruction he had received prohibiting him from calling the OEPA regarding the 4 Log report. During the meeting, Mr. Belcher told Mr. Romero that per Middletown's attorney, Les Landen, Middletown's policy permitted Mr. Romero to call OEPA only to report serious violations, but that he was prohibited from calling the OEPA for anything not related to his specific duties as an Assistant Lab Technician. At all times relevant hereto, Mr. Tadych, Mr. Belcher, Mr. Clemons, and Mr. Landen knew that Mr. Romero's contacts with OEPA constituted speech involving matters of public concern, and that his calls to the OEPA were outside the scope of his duties and were made as a private citizen.

27. While Mr. Romero agreed to follow the chain of command with respect to reporting violations to the OEPA, he disagreed with the instructions that he had received prohibiting him from calling the OEPA concerning any matter not directly involving his Assistant Lab Technician job responsibilities. Mr. Romero stated that Middletown's policy to prohibit him from contacting the OEPA did not sound correct, and he requested that Mr. Belcher provide him with confirmation of Mr. Landen's instructions regarding Middletown's policy as to when he was permitted to contact the OEPA and for what purpose. Mr. Belcher told Mr. Romero that would discuss his request with Mr. Landen and schedule another meeting.

28. Mr. Tadych prepared a "Summary of Meeting" memorandum for the August 15, 2016 meeting with Mr. Romero. The Summary of Meeting stated that Mr. Romero could call the

OEPA any time to report a violation or non-compliance, but that Middletown requested he first notify the Process Control Supervisor or Treatment Plant Manager. The Summary of Meeting also stated that Operations and Management were not included in his job responsibilities, and that the Treatment Plant Manager and/or Process Control Supervisor are responsible for OEPA compliance. The Summary of Meeting further stated that Mr. Romero had refused to comply with these instructions during the meeting, and that violation of Middletown's Policies and Procedures would result in disciplinary action, up to and including termination.

29. On September 27, 2016, Mr. Romero emailed Mr. Belcher about whether Mr. Landen's instructions concerning the policy had been confirmed, following-up on Mr. Belcher's statement to him during the meeting on August 15, that he would discuss Mr. Romero's concerns about the policy with Mr. Landen. Mr. Romero was still seeking clarification as to why Middletown's policy should prohibit him from contacting the OEPA for any questions or concerns not directly related to his job responsibilities. Mr. Belcher responded to Mr. Romero's email by instructing him to meet with Mr. Tadych, Mr. Belcher, and Mr. Clemons.

30. During the September 27 meeting, Mr. Romero was told with emphasis that he was only permitted to contact the OEPA to report major violations, notwithstanding his previous instructions. Mr. Romero stated that he still had not received confirmation that Mr. Landon had determined that Middletown's policy prohibited him from contacting the OEPA with any questions not directly related to his Assistant Lab Technician responsibilities. Mr. Romero was told that the Summary of Meeting he had been provided addressed his questions on this subject, and that the Summary of Meeting was his confirmation regarding Mr. Landon's instructions.

Page 11

31. On October 13, 2016, Mr. Romero was instructed to meet with Mr. Tadych and Mr. Belcher. At the meeting Mr. Romero was told that he was not permitted to call OEPA on anything unrelated to his specific job duties and that he may not voice his concerns about Middletown plant operations, safety issues or any other observations to anyone over anything unrelated to his specific job duties. During the meeting Mr. Romero refused to agree not to contact the OEPA and to stay silent on matters concerning water quality safety and the waste of public resources, irrespective of whether plant safety violations, water quality or other public health issues were outside the scope of his job duties. Mr. Romero was told that because he would not agree to stay silent, his employment with Middletown would be terminated.

32. On October 14, 2016, Mr. Tadych recommended to Mr. Adkins that Mr. Romero be terminated for insubordination, on the grounds that he refused to accept instructions prohibiting him from reporting, observing or discussing matters or contacting the OEPA concerning matters that were outside the scope of his job responsibilities. Mr. Adkins concurred with Mr. Tadych's recommendation and terminated Mr. Romero's employment. Mr. Romero was terminated in retaliation for contacting the OEPA, for his refusal to agree that he would not contact the OEPA in the future, and for his refusal to stay silent as a private citizen concerning water treatment plant safety and water quality issues in violation of Ohio public policy and his known and established First Amendment rights.

33. Mr. Adkins terminated Mr. Romero in the exercise of his policy making authority and discretion, acting in concert with and upon the recommendations of Mr. Belcher, Mr. Tadych, and

Mr. Clemons to knowingly, intentionally, and maliciously deprive Mr. Romero of his First Amendment rights, and to retaliate against Mr. Romero for reporting and refusing to stay silent as a private citizen concerning water treatment plant safety issues and water quality conditions that he reasonably believed were likely to cause an imminent risk of physical harm to persons and a serious hazard to the public health or safety, contrary to the public policy of the State of Ohio. Defendants' actions reflect intentional and deliberate indifference to Mr. Romero's known and established rights and well being and caused him serious injury.

### FIRST CLAIM FOR RELIEF
### (Wrongful Discharge in Violation of Public Policy, as to all Defendants)

34. Mr. Romero hereby incorporates each of the foregoing paragraphs as if fully rewritten herein and further states that:

35. As a part-time Assistant Lab Technician, Mr. Romero was an at-will employee. Various federal and state laws, as expressed in statutes, administrative regulations, court decisions and elsewhere, including R.C. §§ 4101.11 and 4101.12, establish the clear public policy of the State of Ohio supporting work place safety for employees and frequenters, and a statewide policy prohibiting the termination of employees who report conduct and practices contrary to this public policy, including conditions reasonably believed are likely to cause an imminent risk of physical harm to persons and a serious hazard or risk to the public health or safety.

36. Various state and federal laws, as expressed in statutes, administrative regulations, court decisions and elsewhere, including EPA regulations, R.C. Chapters 6109 and 6111, 40 C.F.R. § 141.85, the Safe Drinking Water Act, 42 U.S.C. 300f, *et seq.*, the EPA Surface Water Treatment

Rule, 40 C.F.R. Part 141, and OAC Chapter 3745-81 Primary Drinking Water Rules, establish the clear public policy of the State of Ohio requiring compliance with environmental laws and supporting safe drinking water quality standards, and a statewide public policy prohibiting the termination of employees who report conditions reasonably believed likely to cause imminent risk of physical harm to persons and conduct and practices affecting water treatment and quality posing a serious hazard or risk to the public health or safety.

37. In violation of the clear public policy of the state of Ohio, the Defendants retaliated against Mr. Romero by reducing his hours of work and subsequently terminating his employment. Mr. Romero's reports of conditions that he reasonably believed were likely to cause an imminent risk of physical harm to persons and conduct and practices affecting water treatment and quality posing a serious risk to the public health or safety were a substantial or motivating factor in the Defendants' decision to reduce Mr. Romero's hours of work in attempt to silence him and to subsequently terminate his employment when he refused to be silenced.

38. The Defendants' retaliation against Mr. Romero by reducing his hours of work, threatening his job, and subsequently terminating his employment violates the clear public policy of the state of Ohio and was deliberate, intentional and malicious. The Defendants' actions reflect intentional and deliberate indifference to violate the public policy of the State of Ohio and Mr. Romero's known and established rights and well being, causing him serious injury including loss of income and severe emotional distress.

39. The Defendants lacked any overriding business justification in support of their decision to termination Mr. Romero in violation of Ohio public policy. To permit retaliation against Ohio

employees such as Mr. Romero by employers such as Middletown on the basis of reporting violations of law, rule, regulation, or policy that the employee reasonably believes to be likely to present an imminent risk of physical harm to persons and a serious hazard to the public health or safety places the public policy in jeopardy.

40.     As a direct and proximate cause of the wrongful discharge of Mr. Romero in violation of the clear public policy of the State of Ohio, Mr. Romero has suffered embarrassment, humiliation, severe emotional distress and mental anguish, lost wages and benefits, and has incurred expenses and attorney fees. Mr. Romero is entitled to back pay, front pay, compensatory, and punitive damages in an amount not yet fully ascertained, but in excess of $25,000.00, costs, reasonable attorney fees, and pre-judgment and post-judgment interest.

### SECOND CLAIM FOR RELIEF
### (Violation of First Amendment Rights, as to all Defendants)

41.     Mr. Romero hereby incorporates each of the foregoing paragraphs as if fully rewritten herein and further states that:

42.     At all times relevant hereto, Mr. Adkins, Mr. Belcher, Mr. Clemons, and Mr. Tadych have acted in their individual and representative capacities. The actions of all the Defendants to reduce Mr. Romero's hours of work and then to subsequently terminate his employment for violation of Defendants' policies prohibiting Mr. Romero from voicing his opinion on matters of public concern and refusing to be silenced as a private citizen has a chilling effect on his exercise of First Amendment rights sufficient to deter others from exercising constitutionally protected

rights. Mr. Romero's speech was not disruptive of any legitimate interest of the Defendants to maintain order and did not interfere with the operation of the water treatment facility.

43. The Defendants' actions to retaliate against Mr. Romero for reporting Defendants' conduct in disregard of employee and public safety have deprived Mr. Romero of his First Amendment rights of free expression, in deliberate indifference to Mr. Romero's known and established First Amendment rights. Mr. Romero's exercise of his First Amendment rights was a substantial or motivating factor in the decision to reduce his hours of work and to subsequently terminate his employment, violating Mr. Romero's First Amendment rights as guaranteed by the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, and his rights guaranteed by Section II, Article 1 of the Ohio Constitution.

44. As the direct and proximate result of the Defendants' violation of Mr. Romero's First Amendment rights, Mr. Romero has suffered serious injuries and damages, including mental anguish and emotional distress, embarrassment and humiliation, loss of employment and employment income, employment benefits and pension rights, medical and legal expenses, and out-of-pocket expenses including attorney fees for the cost of pursuing his claims herein. The full amount of such damages has not yet been fully ascertained, but is in excess of $25,000.

WHEREFORE, Mr. Romero respectfully demands judgment against all the Defendants in an amount as yet not fully ascertained, but in excess of $25,000.00, together with pre-judgment interest, interest, costs herein expended, reinstatement, compensatory damages, punitive damages, and reasonable attorney fees, and such other relief as the Court finds just.

Respectfully Submitted,

Folkerth + Routh LLC

*[signature]*
John R. Folkerth, Jr. (0016366)
Trial Attorneys for Plaintiff
500 Performance Place
109 North Main Street
Dayton, Ohio 45402
(937)260-4200
(937)260-4201 (facsimile)
jfolkerth@folkerthlaw.com

JURY DEMAND

Now comes the Plaintiff, Matthew B. Romero, pursuant to Civil Rule 38, and hereby demands a trial by jury herein.

*[signature]*
John R. Folkerth, Jr.