# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**MATTHEW B. ROMERO,**

> **Plaintiff,**

**v.**

**Case No. 1:19-cv-307**
**JUDGE DOUGLAS R. COLE**

**CITY OF MIDDLETOWN, et al.,**

> **Defendants.**

## OPINION AND ORDER

Plaintiff Matthew Romero alleges the City of Middletown, Douglas Adkins, Scott Belcher, Mark Clemons, and Scott Tadych (collectively "Defendants") wrongfully fired him in retaliation for him raising concerns about workplace safety and water treatment quality at the Middletown water treatment plant. The matter is currently before the Court on Defendants' Motion for Judgment on the Pleadings. (Doc. 10). For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion. (Doc. 10).

## BACKGROUND[1]

Matthew Romero worked for the City of Middletown in its Water Treatment Division for a total of ten years. (Compl., Doc. 1-3, ¶¶ 1, 8, #8, 9). He started as a plant operator, then moved up the ranks to Process Control Supervisor. (*Id.* at ¶ 8, #9). Pursuant to Ohio's Public Employees Retirement System, he retired in March 2014.

---

[1] Because this is a motion for judgment on the pleadings, the facts are taken from Romero's Complaint and assumed to be true. *See Bullington v. Bedford Cty.*, 905 F.3d 467, 469 (6th Cir. 2018).

(*Id.*). But by June 2014, Romero was back working at Middletown's Water Treatment Division part-time as an Assistant Plant Lab Analyst ("Assistant Lab Analyst"). (*Id.* at ¶ 9). Romero alleges his job duties included "performing chemical and bacteriological analysis of municipal drinking water samples; quality control procedures; collecting samples; operating and maintaining sampling, analytical procedures, and equipment; customer service; [] water quality concerns; and related work as required by [his] supervisor." (*Id.*). Performing these duties required Romero to pass through the water treatment plant. (*Id.* at ¶ 10). While walking through the plant, Romero allegedly discovered multiple incidents of mismanagement, and unsafe, unlawful, and improper operations and conditions in the water treatment plant, as further detailed below. (*Id.*).

## A. Romero Raised A Series Of Concerns About Issues He Noticed Around The Water Treatment Plant.

*CO₂ Tank*. The first issue Romero observed involved the $CO_2$ tank at the plant in the spring of 2015. (*See id.* at ¶¶ 10–11, #9–10). One day, Romero noticed that a warning light on the liquid $CO_2$ tank was activated. (*Id.* at ¶ 10, #10). After speaking with the plant operator, Romero examined the tank and realized the pressure gauge was broken. (*Id.* at ¶ 11). Romero checked the log records and learned that the plant operators had been inaccurately completing the internal control charts because they were recording the broken gauge's reading. (*Id.*). As a result, there was a critically low level of liquid $CO_2$, which could potentially result in the forty-ton tank rupturing, risking serious injury and death to anyone in that area of the workplace. (*Id.*). Even though it was not within his job duties, once Romero discovered the issue, he

immediately shut down the tank and discussed his concerns with Scott Belcher, Middletown's Water Treatment Manager; Mark Clemons, Middletown's Process Control Supervisor; and Scott Tadych, Middletown's Public Works Director. (*Id.*; *see also id.* at ¶¶ 3–6, #8–9).

That was apparently just the beginning. By early 2016, Romero was observing and reporting unsafe and unlawful conditions around the plant at least weekly. (*Id.* at ¶ 12, #10). These included the following:

*Lime Stock.* In May 2016, Romero allegedly learned some troubling information about the city's lime supply. A plant operator sought out Romero to speak with him about the issue because of Romero's knowledge and experience as a former Process Control Supervisor. (*Id.*). That plant operator told him that the plant was low on lime, and that Middletown could potentially deplete its supply before the next delivery. (*Id.*). Romero alleges that failure to maintain an adequate supply of lime would violate Middletown's Ohio Environmental Protection Agency ("OEPA") permit to operate a lime softening treatment plant (*id.*), but does not allege that these low lime levels at the plant created any risk to water safety or public health. In any event, Romero took action and ordered additional lime. (*Id.*). He subsequently emailed Belcher and Clemons to inform them of the situation and alert them that he had placed an order for an emergency delivery. (*Id.*). Clemons told Romero that he had already ordered extra lime deliveries. (*Id.* at ¶ 13, #11). But Romero knew that was not true—Clemons later admitted as much. (*Id.*). Nevertheless, Clemons still became angry with Romero and told him that running out of lime "wasn't a big deal." (*Id.*).

Romero separately emailed Belcher to tell him that "allowing the lime supply to get so low was simple negligence." (*Id.*).

*Alkalinity Levels and Operator Training*. A few weeks later, Romero observed fluctuations in certain tests that indicated excessive pH and alkalinity levels in the water. (*Id.* at ¶ 14). This concerned Romero and, after speaking with the plant operators, he realized that they were uninformed about important aspects of water quality, such as pH levels, water hardness, and alkalinity, as well as appropriate treatment measures that needed to be taken to address these issues. (*Id.*). Without this knowledge, the plant would be wasting supplies and resources used to control water quality and placing the public health at risk. (*Id.*). In addition to lacking this basic knowledge, Romero also noticed a general lack of training for the plant operators. (*See id.* at ¶ 15, #11–12). For example, Romero noticed that plant operators were not taking the elementary precautions necessary, such as routinely cleaning the storage tanks to prevent the formation of disinfectant by-products. (*Id.*). These disinfectant by-products include haloacetic acids, which have been linked to certain cancers. (*Id.* at #12). Romero informed Belcher and Clemmons, who "did not seem surprised" by Romero's report. (*Id.*). They told Romero that plant operations would improve going forward. (*Id.*).

*Federally Mandated Test Results*. In the summer of 2016, Middletown conducted a routine lead and copper water survey at various residences within the city. (*Id.* at ¶ 16, #12). Around August 3, 2016, Romero received a call from a Middletown resident inquiring about the resident's survey results. (*Id.* at ¶ 22, #14).

4

The call made Romero suspicious that the resident had not been notified of her survey results. (*Id.*). He realized that Middletown had not delivered the federally mandated notifications, and, by the time Romero received the resident's call, Middletown had already missed the deadline to send them. (*Id.*). Under 40 C.F.R. § 141.85, Middletown had thirty days from receiving the lead and copper survey results to notify the residents whose water had been tested about the results. (*Id.*). Romero reported this violation to Clemons in an email. (*Id.*).

At this point, Romero was aware that Belcher and Clemons were becoming increasingly hostile towards his reports of the plant's operating conditions. (*Id.* at ¶ 19, #13). Romero's work hours per week were arbitrarily reduced without explanation. (*Id.*). Romero was told to limit his activities to his job responsibilities— meaning he was not permitted to monitor operations, check the lime level, or perform rounds at the plant. (*Id.*). He also noticed his colleagues' attitudes had changed. (*Id.*). The plant operators had become reluctant to engage him in conversation and ask him questions about plant operations. (*Id.*). But this did not deter him from continuing to report his concerns.

*Incorrectly Preparing OEPA Reports.* Romero assisted Middletown in conducting the lead and copper water survey by preparing sample collections and answering phone calls from residents inquiring about the survey results. (*Id.* at ¶ 16, #12). Romero later learned that the test results for certain samples found that the pH levels fluctuated outside the advised range provided for in the Secondary Drinking

Water Standards issued by the EPA, meaning water quality was at an increased risk. (*Id.*).

Those increased risks could lead to serious concerns with water quality. (*See id.* at ¶ 18, #12–13). For example, allowing high pH levels in the water supply encourages the creation of trihalomethanes, which have been linked to adverse reproductive outcomes and serious cancers. (*Id.* at #13). High pH levels can also reduce the effectiveness of chlorine, which is a disinfectant used to control biological contamination. (*Id.*). Plus, allowing high alkalinity levels could impair the effectiveness of anti-corrosive agents used to prevent the release of lead and arsenic into drinking water. (*Id.*).

The OEPA requires Middletown to produce what Romero calls "4 Log reports," which track disinfection contact time for the water processed through the treatment plant. (*Id.* at ¶¶ 17, 20, #12–13). Romero spoke with Belcher and Clemons about what impact these fluctuating pH results and low chlorine residuals would have on Middletown's reports. (*Id.* at ¶ 17, #12). Belcher and Clemons told Romero that the pH results would not affect the data and calculations recorded in the 4 Log reports. (*Id.*). But Romero knew this was false; pH results were critical to the water quality analysis recorded in those reports. (*Id.*). Given this response, Romero grew concerned that Middletown's procedure for gathering data on the effectiveness of water treatment disinfectant did not comply with OEPA guidelines for collecting data recorded in the 4 Log reports. (*Id.*).

As a result, Romero decided to discuss the matter directly with the OEPA. (*Id.* at ¶ 20, #13). He emailed the OEPA Drinking Water Division requesting guidance with calculating the disinfectant contact time factor recorded on the 4 Log reports. (*Id.*). He ended up speaking with Jeff Davidson from the OEPA on the phone. (*Id.*). Romero asked Davidson whether Middletown's testing procedures properly complied with OEPA's guidance, whether the current guidance document was wrong by chance, and whether other water treatment plants were directed to collect data differently. (*Id.*). Romero explained Middletown's process for the calculations it used in the 4 Log reports. Davidson then indicated that Middletown was preparing the reports incorrectly. (*Id.*).

Romero subsequently emailed Belcher to relay what he learned from Davidson. (*Id.* at ¶ 21, #14). Romero said, "I called the southwest OEPA office and spoke with the person in charge of the drinking water section, since Dan was on extended leave. I will leave it to you to make further adjustments, as the way you are doing it now may be incorrect." (*Id.*). Belcher never followed up with Romero to ask specifically how Middletown might be violating OEPA's compliance guidelines. (*Id.*). Instead, he seemed unconcerned about the potential OEPA violations. (*See id.*).

## B. Romero's Supervisors Grew Agitated With His Reporting And Subsequently Fired Him For Insubordination.

Romero met with Belcher and Clemons on August 4, 2016. The pair appeared upset that Romero spoke with the OEPA regarding the plant's potential compliance violations. (*Id.* at ¶ 24, #15). Romero tried to explain that he called the OEPA for guidance on the 4 Log reports and to reconcile Middletown's procedures in preparing

the report with OEPA's directions. (*Id.*). Belcher and Clemons told Romero that talking to the OEPA was not part of his job duties, and that instead he should follow the plant's chain of command. (*Id.*). That meant instead of going directly to the OEPA, Romero should have spoken with Clemons and Tadych first. (*Id.*).

Following the August 4th meeting, Belcher sent Romero a memorandum concerning instructions Romero had received at the meeting. (*Id.* at ¶ 25). Romero was told the purpose of the memorandum was to clarify Middletown's policy on the matters discussed. (*Id.*). Belcher, in the memorandum, told Romero he had a right to call the OEPA to report Middletown's regulatory violations, but Middletown's policy prohibited him from calling the OEPA concerning Middletown's 4 Log reports because that exceeded his job duties as an Assistant Lab Analyst. (*Id.*).

Romero subsequently requested another meeting to discuss these instructions. (*Id.* at ¶ 26, #16). On August 15, 2016, Romero, Tadych, Belcher, and Clemons all sat down to discuss the issue. (*Id.*). During this meeting, Belcher told Romero that, per Middletown's attorney, Les Landen, Middletown's policy permitted Romero to call the OEPA only to report serious violations, and otherwise prohibited him from calling the OEPA for anything not related to his specific duties as an Assistant Lab Analyst. (*Id.*). While Romero agreed he would follow the plant's chain of command concerning reporting violations to the OEPA, he disagreed with Belcher's instructions prohibiting him from calling the OEPA regarding matters not directly involved with his job responsibilities. (*Id.* at ¶ 27). He asked Belcher to provide him with confirmation on Landen's instructions, specifically regarding when Romero could

contact the OEPA and for what purpose. (*Id.*). Belcher said he would discuss Romero's request with Landen and schedule another meeting with Romero to discuss Landen's response. (*Id.*).

After the August 15th meeting, Romero received another meeting summary memorandum, this time prepared by Tadych. (*Id.* at ¶ 28, #16–17). That memorandum stated that if Romero wanted to report the Middletown water treatment plant to the OEPA, he would have to first notify the Process Control Supervisor or Treatment Plant Manager. (*Id.* at #17). Operations and management were not within his job responsibilities, the letter explained, and instead the Supervisor or Plant Manager was responsible for OEPA compliance. (*Id.*). If Romero refused to comply with these instructions and follow the chain of command before reporting, the letter cautioned, then Romero could be disciplined up to and including termination. (*Id.*).

On September 27, 2016, Romero followed up with Belcher regarding his request that Landen confirm the OEPA reporting policy. (*Id.* at ¶ 29). In response, Belcher invited Romero to meet with him, Tadych, and Clemons. (*Id.*). The group met that same day. (*Id.* at ¶ 30). Romero was told "with emphasis" that he could only contact the OEPA to report major violations, notwithstanding his previous instructions. (*Id.*). Romero reported that he was still waiting on the confirmation of the policy that Belcher promised from Landen. (*Id.*). Romero was told that he would not be receiving that confirmation, and instead the August 15th meeting summary memorandum served as confirmation of Landen's instructions. (*Id.*).

A few weeks later, on October 13, 2016, Romero met with Tadych and Belcher. (*Id.* at ¶ 31, #18). Tadych and Belcher told Romero not only that he was not permitted to call the OEPA about anything unrelated to his specific job duties, but that he may not voice his concerns about the Middletown plant's operations or safety issues, or his other observations to anyone over anything unrelated to his specific job duties. (*Id.*). Romero refused. (*Id.*). He did not agree to stay silent on matters concerning water quality safety and wasting public resources, irrespective of whether plant safety violations, water quality, or other public health issues were outside the scope of his job duties. (*Id.*). Tadych and Belcher told Romero that because he would not agree to stay silent, he would be fired. (*Id.*).

The next day, Tadych recommended to Douglas Adkins, the Middletown Manager, that Romero be fired  for insubordination because he refused to accept instructions prohibiting him from reporting, observing, or discussing matters or contacting the OEPA concerning matters that were outside the scope of his job responsibilities. (*Id.* at ¶ 32). Adkins agreed and terminated Romero's employment. (*Id.*).

## PROCEDURAL HISTORY

Romero sued the Defendants in the Butler County Court of Common Pleas on March 27, 2019. (*See* Notice of Removal, Doc. 1). He alleged two causes of action: wrongful discharge in violation of public policy under Ohio law and retaliatorily discharge in violation of the First Amendment. (*See* Compl. at #7–22). Defendants removed the case to federal court on April 29, 2019. (*See* Doc. 1). On September 30,

2019, Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Doc. 10). That motion is currently before the Court.

## LAW AND ANALYSIS

### A.     Standard Of Review.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is analyzed in the same manner as a motion to dismiss under Rule 12(b)(6). *See Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). This means the Court must accept all well-pled allegations as true, and draw all reasonable inferences in the plaintiff's favor. *See Bullington v. Bedford Cty.*, 905 F.3d 467, 469 (6th Cir. 2018). All a plaintiff need do is provide "a short and plain statement of the claim showing that the pleader is intitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

Importantly, though, the "short and plain statement" must offer more than mere "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "'[A] formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). There must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). This means a complaint must contain "either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quotation omitted). "Conclusory allegations or legal conclusion masquerading as factual allegations will not suffice." *Id.* (citing *Meziboy v. Allen*, 411

F.3d 712, 716 (6th Cir. 2005)). In sum, an action will be dismissed under this standard where "there is no law to support the claims made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.*

**B.  Romero's Ohio Law Wrongful Discharge Claim Fails As A Matter Of Law As Currently Pled, But His First Amendment Retaliation Claim Survives Judgment On The Pleadings.**

Defendants argue that Romero's Complaint should be dismissed because (1) Romero's wrongful discharge in violation of public policy claim fails to satisfy the required clarity and jeopardy elements for such claims under Ohio law, (2) Romero's First Amendment claim does not involve private citizen speech on a matter of public concern, and (3) even if Romero's First Amendment claim is meritorious, the individual defendants are entitled to qualified immunity. (*See* Defs.' Mot. for J. on the Pleadings ("Defs.' Mot."), Doc. 10, #83–100). The Court agrees that Romero's wrongful discharge in violation of public policy claim should be dismissed (albeit without prejudice). But the Court finds that Romero alleged sufficient facts to withstand judgment on the pleadings on his First Amendment retaliatory discharge claim. Because the Court finds Romero's First Amendment claim plausibly alleges a constitutional violation, and also finds that the right at issue was clearly established at the time the individual defendants fired Romero, the Court declines to grant the individual defendants qualified immunity at this time.

1.  **Romero's Ohio Law Wrongful Discharge In Violation Of Public Policy Claim Fails Because He Has Not Satisfied The Clarity Element.**

Employment in Ohio, including employment with state or local government bodies, is generally governed by the employment at-will doctrine. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529 (Ohio 2002). Accordingly, an employer generally may terminate an at-will employee for any reason at any time, and that terminated employee may not sue the employer for wrongful discharge. *Id.* But there are exceptions to this doctrine. One such exception, relevant here, allows a terminated employee to bring a wrongful discharge claim when the discharge violates public policy, which Ohio courts commonly refer to as a *Greeley* claim. *Miracle v. Ohio Dep't of Veterans Servs.*, 137 N.E.3d 1110, 1113 (Ohio 2019) (citing *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990)).

Making a claim for wrongful discharge in violation of public policy—a *Greeley* claim—requires that a plaintiff establish each of four elements: (1) that a *clear* public policy existed and was manifested either in a state or federal constitution, statute, or administrative regulation, or in the common law (the "clarity element"); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize that public policy (the "jeopardy element"); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the "causation element"); and (4) that the employer lacked an overriding legitimate business justification for the dismissal (the "overriding-justification element"). *Miracle*, 137 N.E.3d at 1113 (citing *Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995)). The first two elements—clarity and jeopardy—are questions of law for a court

to decide. *Collins*, 652 N.E.2d at 658. Whereas, as a general matter, the last two elements—causation and overriding-justification—involve factual issues for a factfinder to decide. *Id.*

Not surprisingly, given this distinction, at the motion for judgment on the pleadings stage Defendants are challenging Romero's ability to establish the first two elements: clarity and jeopardy. Because the Court finds Romero has not satisfied the first element (clarity), it does not address the second (jeopardy).

In an effort to meet the clarity element, Romero claims his termination violated two general categories of public policies. First, he says it violates public policies generally relating to water safety, such as "requiring compliance with environmental laws[,]" "supporting safe drinking water quality standards[,]" and prohibiting employers from terminating employees who report "conditions reasonably likely to cause imminent risk of physical harm to persons" and conduct "affecting water treatment and quality posing a serious hazard or risk to the public health or safety." (Compl. at ¶ 36, #20). Second, he says his termination violated the public policy "supporting work place [sic] safety for employees" and prohibiting employers from terminating "employees who report conduct and practices contrary to this public policy[.]" (Compl. at ¶ 36, #19). For various reasons, as explained below, neither of those work, at least as currently pled.

As noted, "clear public policy" supporting an exception to the employment-at-will doctrine may be found in federal or state constitutions, statutes, administrative rules and regulations, and common law. *Sutton v. Tomco Machining, Inc.*, 950 N.E.2d

938, 943 (Ohio 2011). One source for such a "clear public policy" is Ohio's whistleblower statute, Ohio Revised Code § 4113.52. This statute reflects the public policy of protecting "whistleblowers" from retaliation, a public policy that seems plausibly implicated on the allegations here. The problem for Romero, though, is that the whistleblower statute also imposes strict procedural requirements that a whistleblower must follow in order to claim protection under the statute, and Romero concedes he did not comply with those requirements here. Therefore, he "cannot base a *Greeley* claim solely upon the public policy embodied in that statute." *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 323 (Ohio 1997) (citing *Contreras v. Ferro Corp.*, 652 N.E.2d 940, 945–46 (Ohio 1995)).

Having elected not to follow the whistleblower statute's procedural requirements, Romero must identify some other source of "clear public policy" to support his claim. And in doing so, he must meet two requirements. First, Romero must both *specifically* identify the sources, and also identify specific policies located within those specific sources, rather than make general assertions to broad policies (this Opinion refers to these two collectively as the specificity requirement). *Hale v. Mercy Health Partners*, 20 F. Supp. 3d 620, 639 (S.D. Ohio 2014). Second, the sources of the public policies must parallel Ohio's whistleblower statute (i.e., a parallelism requirement).[2] *See Hale v. Mercy Health Partners*, 617 F. App'x 395, 403 (6th Cir.

---

[2] As this Court has previously pointed out, Ohio courts have implicitly imposed this requirement. *See Nelson v. A Place for Mom, Inc.*, No. 3:19-cv-377, 2020 WL 635797, at *3 n.2 (S.D. Ohio Feb. 11, 2020) (citing *Hale*, 20 F. Supp. 3d at 638, *aff'd*, 617 F. App'x 395 (6th Cir. 2015)). After the Sixth Circuit's decision in *Hale*, where the court agreed that Ohio courts require that a plaintiff's claimed policy parallel Ohio's whistleblower statute, *see Hale*, 617 F. App'x at 403, the Ohio Supreme Court accepted jurisdiction in an unrelated case in which

2015) (citing *Dean v. Consol. Equities Realty #3, L.L.C.*, 914 N.E.2d 1109, 1112 (Ohio Ct. App. 2009). This parallelism requirement means that the source for the public policy on which Romero relies must be of a type that either (1) imposes an affirmative duty on employees to report a violation, (2) prohibits employers from retaliating against employees who file complaints on the topic, or (3) is designed to protect the public's health and safety. *Id.* So, for example, a child abuse statute that imposed a reporting obligation on a person (e.g., a teacher) would satisfy the parallelism requirement.

### a. Public Policy Promoting Safe Drinking Water.

Regarding the alleged public policy relating to safe drinking water, Romero stumbles a bit out of the gate, as he fails to cite a clear, specific source for the policies on which he purports to rely. He acknowledges this shortcoming in his briefing, stating that he "is not asserting the violation of a specific safety law or environmental law to support his public policy wrongful discharge cause of action." (Memo. in Opp'n to Defs.' Mot. for J. on the Pleadings ("Pl.'s Opp'n"), Doc. 12, #111). Instead of any specific source, he alleges in his Complaint that the Court can find the source of this public policy generally in "EPA regulations, R.C. Chapters 6109 and 6111, 40 C.F.R. § 141.85, the Safe Drinking Water Act, 42 U.S.C. 300f, et seq., the EPA Surface Water

---

the three-part standard reflected in *Dean* was challenged. *See McGowan v. Medspace, Inc.*, 150 Ohio St.3d 296 (2017). Even though *McGowan* presented the Ohio Supreme Court with an opportunity to overrule the *Dean* standard, it chose not to do so. "Thus, absent an opinion from the Supreme Court of Ohio expressly rejecting the *Dean* standard, this Court will follow the interpretation of state law previously reached by its circuit." *Stromberger v. Tampico Beverages, Inc.*, No. 1:16-cv-1117, 2017 WL 4310509, at *4 (S.D. Ohio Sept. 28, 2017).

16

Treatment Rule, 40 C.F.R. Part 141, and OAC Chapter 3745-81 Primary Drinking Water Rules[.]" (Compl. at ¶ 36, #19–20).

That presents a problem, as he needs a *specific*, *clear* legal source for any public policy he asserts. That is because, as Ohio courts routinely admonish, the public policy doctrine must be "narrowly applied." *See, e.g.*, *Mitchell v. Mid-Ohio Emergency Servs., L.L.C.*, No. 03AP-981, 2004 WL 2803419, at *6 (Ohio Ct. App. Sept. 30, 2004) (refusing to extend the "*narrow* public policy exception to the employment at-will doctrine") (emphasis in original). The mere fact that a particular subject matter area (like drinking water standards) is addressed in a statute or regulation does not mean that the statute or regulation sets forth a clear public policy. *Hale*, 20 F. Supp. 3d at 639. "Accepting an argument that a clear public policy is established because an administrative regulation covers the subject matter at issue would expand the public policy claim to all statutory and administrative enactments." *Id.* Thus, Ohio courts insist that the source of public policy must be "so manifestly clear to warrant abrogating the employment[-]at-will doctrine." *Id.* As otherwise, "the exception would swallow the rule." *Id.*

Romero's sources are not "manifestly clear" and thus they do not pass muster. A string cite to a collection of safety statutes and regulations doesn't cut it. *See Lesko v. Riverside Methodist Hosp.*, No. 04AP-1130, 2005 WL 1482549, at *9 (Ohio Ct. App. June 23, 2005) (finding that an employee who merely listed examples of safety statutes failed to establish "clear public policy applicable to the facts of [the] case"). Likewise, broadly citing entire sections of the United States Code, or "EPA

17

regulations" at large, is not specific enough. *See Hale*, 20 F. Supp. 3d at 639 (refusing to accept that a clear public policy is established merely because an administrative regulation covers the subject matter at issue). Nor, for similar reasons, does it work to generally cite the entirety of *chapters* of the Ohio Revised Code that deal with water pollution and safe drinking water. (*See* Compl. at ¶ 36, #19 (citing Ohio Rev. Code §§ 6109, 6111)). Without citing a particular section or sections within those chapters, such references are simply too general to meet the specificity requirement for his claim.

Romero's most specific citation is likely 40 C.F.R. § 141.85. But that citation fails for a different specificity reason. That regulation perhaps can be characterized as a public safety provision, as it lays out the procedures for notifying the public about lead levels in their drinking water and the steps that the public can take to avoid adverse health consequences if their water in fact has high lead levels. But, here, Romero's claim seems to be one of minor technical non-compliance—failure to strictly abide by the must-send-the-report-in-thirty-days timing requirement, rather than failure to send the report *at all*. (*See id.* at ¶ 22, #14). Moreover, nowhere does he allege that the lead in the water was in fact high, such that failure to strictly abide by the time limits may have lengthened the exposure of Middletown citizens to water carrying unsafe amounts of lead.

In that sense, Romero's reliance on 40 C.F.R. § 141.85 is similar to the source of public policy from *Hale* that both the district and circuit court found merely imposed technical requirements. In *Hale*, the plaintiff relied on Ohio Administrative

18

Code § 4729-17-03. 20 F. Supp. 3d at 637. The plaintiff claimed that § 4729-17-03 supported the public policy that pharmacies maintain proper transport and record-keeping procedures to ensure they properly account for narcotics—which of course could be understood as a public safety issue. *Id.* But the court instead treated the provision as a record-keeping regulation, and found that, as such, it did not reflect a public policy that was "manifestly clear" enough to warrant abrogating the employment at-will doctrine. *Id.* at 639. Rather, the regulation merely created "baseline technical requirements that [] facilities had to satisfy to operate their facilities." *Id.* at 640; *see also Morris v. Dobbins Nursing Home*, No. CA2010-12-102, 2011 WL 2449008, at *4 (Ohio Ct. App. June 20, 2011) (noting that "Ohio does have an interest in ensuring that nursing home facilities are operated safely and in accordance with the law," but finding that the Code of Federal Regulations sections upon which the plaintiff relied "merely provide[d] baseline technical criteria that Dobbins Nursing Home had to meet in order to operate the nursing home facility"). Likewise, here, 40 C.F.R. § 141.85 could be characterized as merely imposing technical requirements that the State must meet to keep the public informed about the lead tap water monitoring results, rather than creating a public policy promoting safe drinking water—at least a sufficiently clear public policy in that regard to warrant abrogating the employment-at-will doctrine.

Moreover, even if 40 C.F.R. § 141.85 *could* be understood as embodying a clear public policy, Romero fails to specifically identify what that alleged public policy is. Rather, he merely groups that citation in a list with many others (*see* Compl. at ¶ 36,

#19–20), which he says collectively reflect "the clear public policy of the State of Ohio requiring compliance with environmental laws and supporting safe drinking water quality standards[.]" (*Id.* at #20). That is not a specific public policy tied to a specific legal source.

To be sure, his allegations as currently stated may well have supported a claim under Ohio's whistleblower statute. But, as already noted, he failed to take the procedural steps required to perfect such a claim.

As Romero has not identified a clear, specific source for the public policy promoting safe drinking water on which he relies, the Court declines to do so for him. Ohio courts are clear that it is the plaintiff's burden to identify the public policy and the sources for that policy. *Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 831 (Ohio 2011). A court may not do so sua sponte, as "[t]here may be valid reasons for a plaintiff's failure to identify and assert a specific public policy or a specific source for that public policy." *Id.* The court "may not fill in the blanks on its own motion." *Id.*

All of that being said, the Court certainly does not ignore the possibility that Ohio law or federal law may somewhere articulate a clear and specific public policy in favor of safe drinking water, or in favor of some particular aspect of water safety. Indeed, clear statements of such a public policy may well be located at points within the broad swaths of law that Romero cites. Accordingly, while the Court finds that Romero has so far failed to meet his burden of identifying a specific public policy, and the specific source for that public policy, on which to rely as the basis for his wrongful

discharge claim, the Court will allow Romero an opportunity to amend his Complaint to address the shortcomings identified above, if he can.

### b. **Public Policy Promoting Workplace Safety**.

Having found that Romero has yet to specifically identify a public policy related to drinking water safety that will support his claim, the Court now turns to the second general area of public policy Romero identified: workplace safety. In his briefing, Romero cites *Ptylinski v. Brocar Products, Inc.*, 760 N.E.2d 385, 386 (Ohio 2002), for the proposition that "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." But the Ohio Supreme Court later clarified that merely citing the syllabus in *Ptylinski* is "insufficient to meet the burden of articulating a clear public policy of workplace safety." *Dohme*, 956 N.E.2d at 830. Instead, "to satisfy the clarity element of a claim of wrongful discharge in violation of public policy, a terminated employee must articulate a clear public policy by citation of specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law." *Id.* at 831.

Here, to support his public policy regarding workplace safety, Romero does provide specific citations—Ohio Revised Code §§ 4101.11 and 4101.12. (Pl.'s Opp'n at #109). Section 4101.11 provides that:

> Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of

> employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

Ohio Rev. Code § 4101.11. Likewise, § 4101.12 deals generally with employers not forcing employees to work in unsafe environments:

> No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

Ohio Rev. Code § 4101.11.

But, while these are specific statutes, the Ohio courts that have considered those statutes have concluded that the policies reflected therein are "very general and broad," and thus the policies are not specific enough to satisfy the clarity element of a wrongful discharge in violation of public policy claim. *See Whitaker v. First Energy Nuclear Operating Co.*, No. OT-12-021, 2013 WL 4792860, at *6 (Ohio Ct. App. Sept. 6, 2013); *see also Galyean v. Greenwell*, No. 05CA11, 2007 WL 453273, at *14 (Ohio Ct. App. Jan. 29, 2007) (finding that § 4101.11 deals with "traditional premises liability" and is not "sufficiently specific" to serve as a basis for the claim). The Court is inclined to agree with these Ohio courts on this matter of Ohio law. Although these statutes are certainly directed at the broad topic of workplace safety, and adopt a general rule that work premises should be maintained in a safe manner, they do not appear to articulate any specific public policy of the type that would support a discharge in violation of public policy claim, thus falling short on the specificity front.

Thus, to date, Romero has not identified a clear source for a sufficiently specific public policy supporting workplace safety to support a claim of discharge in violation of public policy. Accordingly, the Court will **DISMISS** that claim, but for the reasons stated above, does so **WITHOUT PREJUDICE**.

      **2.**     **Romero Spoke As A Citizen On Matters Of Public Concern, And Therefore His First Amendment Retaliation Claim Survives Judgment On The Pleadings.**

Defendants argue that Romero's First Amendment retaliation claim should be dismissed because: (1) he spoke pursuant to his official duties as a Middletown employee, (2) on a matter not of public concern. Defendants are wrong on both accounts, and therefore the Court denies their request for judgment on the pleadings on this claim.

The First Amendment "guarantees freedom of expression" and prohibits Congress, and by incorporation state actors, from restricting "the rights of individuals to speak freely." U.S. Const. amend. I; *see Gitlow v. People of State of N.Y.*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment). The First Amendment protects the speech rights of a public employee. As relevant here, a public employer cannot retaliate against an employee based on the employee's exercise of his or her First Amendment rights.

To prevail on his First Amendment retaliation claim against Defendants for terminating his employment, Romero must prove "(1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor'

in the adverse action." *Haddad v. Gregg*, 910 F.2d 237, 243 (6th Cir. 2018) (citation omitted). If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. *Mertins v. City of Mount Clemens*, --- F. App'x ----, No. 19-1416, 2020 WL 3032929, at *3 (6th Cir. June 5, 2020).

Romero's speech here occurred in the context of his public employment, which impacts the First Amendment analysis to some extent. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). While a public employee does not shed their First Amendment rights merely because of their government employment, the First Amendment's protection is not as robust as it is in other contexts. In particular, public employee speech receives First Amendment protection only when the employee "speak[s] as a citizen addressing matters of public concern." *Id.* at 417 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). In adopting this limitation, the Court sought to accommodate the inherent tension between affording public employees adequate First Amendment protection, but not constitutionalizing every employee grievance. *See id.* at 420.

This Court's resolution of the pending motion requires a three-step inquiry under *Garcetti*. The first question is whether the speech at issue was made pursuant to Romero's official duties. *Garcetti*, 547 U.S. at 417. Speech "pursuant to the employee's official duties" (i.e., "employee-speech") is unprotected. *Id.* at 413. But for

speech *outside* that realm, or in other words, where the public employee is speaking as a citizen (i.e., "citizen-speech"), the second step asks whether the speech touches on a matter of public concern. *Id.* (citations omitted). If not, the speech, even as citizen-speech, will not support a First Amendment claim. At bottom, if the Defendants can show that Romero's speech here was either (1) employee-speech or (2) citizen-speech that did not involve a matter of public concern, then Romero's First Amendment claim fails as a matter of law. Conversely, if Romero can show that his speech was citizen-speech (i.e., non-employee-speech), *and* that the speech involved a matter of public concern, the analysis then continues to a third step. In that step, the Court must balance the interests served by Romero's speech against the City's need to promote "the efficiency of the public services it performs through its employees." *Id.* at 417 (quotation and citation omitted). As the description suggests, this third step is poorly suited for resolution at the judgment on the pleadings stage. *See Baar v. Jefferson Cty. Bd. of Educ.*, 476 F. App'x 621, 633 (6th Cir. 2012).

### a.   Romero Did Not Speak Pursuant To His Official Duties, Making His Speech "Citizen Speech."

The first step in a public-employee First Amendment retaliatory discharge case is determining whether the speech at issue constitutes "citizen-speech." In making that determination, this Court is mindful that *Garcetti* is not the Supreme Court's last word on the employee-speech/citizen-speech dichotomy. More recently, in *Lane v. Franks*, 573 U.S. 228, 240 (2014), the Supreme Court modified *Garcetti*'s "official duties" language by adding the term "ordinary." That is, under *Lane*, to take advantage of the "official duties" exception to First Amendment protection (i.e., to

show that the speech is employee-speech outside the protection of the First Amendment), the public employer must show the speech related to the employee's "ordinary job responsibilities." *Id.* And the Sixth Circuit, in an even more recent decision, concluded that the Supreme Court's intent in adding the word "ordinary" was to avoid transforming broad swaths of speech by employees into unprotected employee-speech "simply because it concern[ed] … the speaker's public employment." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463 (6th Cir. 2017).

Keeping all that in mind, as the Sixth Circuit observed, "[d]etermining whether an employee speaks as a private citizen or as a public employee can be challenging," but the "inquiry is a practical one." *Mayhew*, 856 F.3d at 464 (quotation omitted). This inquiry is also a legal one, suitable for resolution by the Court. *Colorez v. City of Cincinnati*, 441 F. Supp. 3d 560, 569 (S.D. Ohio 2020) ("The Sixth Circuit has confirmed though, that, notwithstanding some cases from other Circuits suggesting otherwise, the pursuant-to inquiry is a legal question that this Court must resolve.") (citing *Mayhew*, 856 F.3d at 462–64). "Actually *answering* that legal question, however, remains a difficult task." *Id.* (emphasis in original).

Despite *Garcetti*, *Lane*, and a substantial body of precedent, there is still no "comprehensive framework for defining the scope of an employee's duties." *Mayhew*, 856 F.3d at 464. Rather, as noted above, courts are to make a "practical" inquiry. *See id.* (quoting *Garcetti*, 547 U.S. at 424). To assist in that endeavor, the Sixth Circuit has identified several "factors to consider" including: (1) the impetus for the speech; (2) the setting of the speech; (3) the speech's audience; and (4) the general subject

matter (the "*Weisbarth* factors"). *See Aquilina v. Wrigglesworth*, 759 F. App'x 340, 344 (6th Cir. 2018) (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540–41 (6th Cir. 2007)). The Sixth Circuit has noted that additional considerations include whether the statements were made to individuals "up the chain of command," *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010), and whether the content of the speech is "nothing more than the quintessential employee beef: management has acted incompetently." *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007) (quotation omitted).

While the factors are helpful, the "weight and consideration afforded" to each factor, and the "manner of resolving conflicts among them," remains ambiguous. *Colorez*, 441 F. Supp. 3d at 569. At bottom, it appears that the Court is to ask "who, where, what, when, why, and how," in deciding whether particular speech suffices to support a First Amendment retaliatory discharge claim. *Mayhew*, 856 F.3d at 464.

Here, the only source of information regarding Romero's job duties at this point (i.e., before discovery has occurred) is Romero's Complaint. There, he describes his duties as: "performing chemical and bacteriological analyses of municipal drinking water samples, quality control procedures; collecting samples; operating and maintaining sampling, analytical procedures, and equipment, customer service, and water quality concerns; and related work as required by supervisor." (Compl. at ¶ 9, #9).

With those job duties in mind, Romero alleges Defendants fired him for engaging in the following speech: (1) reporting to his supervisors concerns about the

condition of the $CO_2$ tank (*Id.* at ¶¶ 10–11, #9–10); (2) reporting to his supervisors that he was forced to order lime because the stock was too low, which is against OEPA regulations (*Id.* at ¶¶ 12–13, #10–11); (3) reporting to his supervisors that plant operators did not have enough knowledge about pH and alkalinity levels (*Id.* at ¶ 14, #11); (4) reporting to his supervisors that plant operators were not taking enough precautions to prevent formation of disinfectant by-products (*Id.* at ¶ 15, #11–12); (5) reporting to his supervisors that the plant's procedure for gathering water treatment disinfectant effectiveness was not in compliance with OEPA guidelines (*Id.* at ¶ 17, #12); (6) discussing with the OEPA how Middletown incorrectly prepared its 4 Log reports (*Id.* at ¶ 20, #13); (7) reporting to his supervisors that Middletown had not sent federally mandated notifications to residents about lead and copper survey results (*Id.* at ¶ 22, #14); and (8) reporting to his supervisors concerns about certain wells that tested for excessive levels of arsenic contamination and additional miscellaneous issues involving dust suppression, secondary basin malfunction, reservoir operations, and Middletown's failure to disclose an inoperable lime slaker to the OEPA (*Id.* at ¶ 23, #14–15).

The parties disagree about whether each instance of speech was within Romero's job responsibilities. Defendants claim his job responsibilities and his speech are one in the same. In fact, Romero's speech "owed its existence to" his employment. (Defs.' Mot. at #97). That is because, according to Defendants, Romero discovered these issues while walking around the water treatment plant and walking around the water treatment plant is one of Romero's job duties. (*See* Defs.' Reply, Doc. 13,

#134). Defendants characterize Romero raising concerns as an "inherent duty of internal communication," which can be a de facto duty that is within the scope of his employment. (*Id.* (citing *Mayhew*, 856 F.3d at 465)). Defendants also claim that Romero only talked internally, and not publicly, about his concerns. (Defs.' Mot. at #98). And Romero did not allege that he attempted to make any of his purported concerns public. (*Id.*). For his part, Romero maintains that none of his speech involved activities that fell within his job duties. (Pl.'s Opp'n at #117). He also claims that his speech need not be directed toward anyone in the public to be protected by the First Amendment. (*See id.* at #118).

At this juncture, viewing only the allegations in Romero's Complaint and accepting those allegations as true, the Court finds Romero has alleged sufficient facts to support a claim that he was engaged in protected citizen-speech.

The "critical question" for this analysis is "whether *the speech at issue* is itself *ordinarily* within the scope of [Romero's] duties." *Id.* The Court finds it is not. Taking a "practical" look at Romero's "ordinary" job duties, the Court concludes the issues Romero raised fall more in the purview of a supervisor or plant manager, rather than an Assistant Lab Analyst.

Certainly, the allegations in the Complaint (which must be accepted as true at this stage) suggest that much of the speech at issue fell outside Romero's job responsibilities. He alleges, for example, that he raised concerns about operator training and water treatment procedures, even though "operator training and water treatment procedures were not included in Mr. Romero's job responsibilities." (Compl.

at ¶ 15, #11). He further alleges that, in response to his speech, his supervisors told him to "limit his activities to his job responsibilities," strongly suggesting that they considered his speech to fall outside those responsibilities. (*Id.* ¶ 19, #13). Romero further specifically alleges that he reported "concerns about wells 16 and 17, which had tested for excessive levels of arsenic contamination," and that he had also reported "violations and hazards involving dust suppression, the secondary basin malfunction, reservoir operations, and Middletown's failure to disclose an inoperable slaker to the OEPA," and that "none of the issues" were "involved in Mr. Romero's job responsibilities." (*Id.* at ¶ 23, #14–15).

Indeed, he specifically claims that one of the concerns his supervisors raised with him was that he was speaking outside the area of his assigned responsibilities. Romero alleges that, when he told his supervisors he had called the OEPA, he "was told [by his supervisors] that talking to the OEPA was not part of his job duties, and he was instructed to follow the chain of command," (*id.* at ¶ 24, #15), and that such calls "exceeded the scope of his job duties as an Assistant Lab Technician," (*id.* ¶ 25). Accepting these allegations as true, Defendants cannot have it both ways— disciplining Romero because his speech "exceeded the scope of his job duties," but now defending against his claim for retaliatory discharge by asserting that the speech in fact fell within those job duties.

In many ways, the analysis here parallels the Sixth Circuit's in *Handy-Clay v. City of Memphis*, 695 F.3d 531 (6th Cir. 2012). The City of Memphis hired Handy-Clay as a public records coordinator. *Id.* at 535. Her duties included handling public

records requests, reviewing documents to prevent confidential information from being disclosed, and recording the minutes of the Memphis Charter Commission. *Id.* at 535–36. The city fired Handy-Clay after she spoke up about city employees not properly reporting their absences on the attendance log and voiced concerns about the city improperly using funds, among other things. *Id.* at 542. She sued the city for firing her in retaliation for exercising her First Amendment rights. Two factors made the Sixth Circuit decide that this speech fell outside her ordinary job responsibilities.

First, she was not asked to investigate the alleged misconduct or to give her opinion on any violations. *Id.* In that sense, the Sixth Circuit distinguished Handy-Clay's case from *Weisbarth*, in which a park ranger made critical comments about her department's "morale and performance issues," but made the comments only in response to a paid consultant's queries, at her employer's behest. 499 F.3d at 543, 546. In contrast, Handy-Clay's comments, like those of the plaintiff in *Pucci v. Nineteeth Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010), were "extraordinary rather than everyday communication." Likewise, here, Romero was not tasked with investigating the conditions around the plant, nor with monitoring Middletown's compliance with every regulatory obligation. The comments on which he relies here were not prompted by his supervisor's request to inspect plant operations or to give his opinion on whether Middletown was complying with the required regulations. And he was under no specific obligation to report anything he saw to his supervisors.

Second, the Sixth Circuit found that Handy-Clay's conversations with individuals outside her department were not within her job duties as a public records

coordinator. The Sixth Circuit found this distinguished Handy-Clay's case from *Fox* and *Haynes* because the plaintiffs in those cases made complaints only to their immediate supervisors. *See Fox*, 605 F.3d at 350 (noting that "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job"); *Haynes*, 474 F.3d at 364 ("The fact that Haynes communicated solely to his superior also indicates that he was speaking 'in [his] capacity as a public employee contributing to the formation and execution of official policy,' not as a member of the public[.]" (alteration in original) (quoting *Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006))). Similarly here, while Romero did voice concerns to his supervisors, he also spoke with people outside the water treatment plant. He spoke with an individual at the OEPA about the Middletown plant's compliance with their reporting procedures, a conversation that, as noted, his supervisors specifically told him was outside his job responsibilities.

To be sure, Defendants are correct that one common denominator across *most* of Romero's speech it that it was made to his supervisors, a factor that Defendants likewise are correct in observing cuts in their favor. But that factor is not dispositive here. In those cases where the Sixth Circuit emphasized that speech made "up the chain of command" supported a finding that the speech was unprotected employee-speech, the speech at issue involved typical "employee beef[s]" pertaining to his or her employment. *See, e.g.*, *Mayhew*, 856 F.3d at 466 ("When a public employee raises complaints or concerns up the chain of command at his workplace *about his job duties*,

that speech is undertaken in the course of his job.") (emphasis added); *Keeling v. Coffee Cty.*, 541 F. App'x 522, 527 (6th Cir. 2013) (holding the speech was not protected because "[m]ost importantly, her speech *pertained to her employment* ... and was made up the chain of command.") (emphasis added); *Fox*, 605 F.3d at 350 (holding a teacher's complaints made directly to her supervisor *about class size* were not protected); *Burgess v. Paducah Area Transit Auth.*, 387 F. App'x 538, 545 (6th Cir. 2010) (holding communications made at the workplace, *related to office management*, and directed to management were not protected); *Haynes*, 474 F.3d at 364 (finding first that "all of the speech at issue in this case … was made pursuant to [Haynes's] official duties, then also finding the fact that Haynes communicated "solely to his superior" indicates that he was "speaking 'in his capacity as a public employee'"). That is a critical distinction here. In Romero's case, he alleges that he was not making typical employee complaints (i.e., about his job responsibilities) up the chain of command, but rather claims that he was trying to raise the alarm about water quality with public officials who he believed were in a position to address those concerns. Given that the speech here falls outside the context of "employee beefs," the cases holding that "up the chain" communication generally constitutes employee-speech are not dispositive on Romero's claim.

And while it is true that Romero discovered some of these issues while walking from Point A to Point B at the water treatment plant, and some complaints generally concern the water treatment plant where he works, that does not mean his speech is not protected by the First Amendment. In fact, cases find the opposite to be true—

just because the speech relates to the person's public employment does not mean it is employee-speech. The Supreme Court reiterated this point in *Lane*. The Court emphasized that "speech made by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240. Here, then, the mere fact that Romero learned about these issues while he walked around the water treatment plant at work is not dispositive. Therefore, Romero's speech is properly characterized as citizen-speech.

The Court reaches that same result analyzing the *Weisbarth* factors as well. The first factor—the impetus for the speech—at least arguably weighs in Romero's favor. Although not completely explicit in his Complaint, it appears that Romero's speech arose from his concerns over water quality, public health, compliance with government regulations, and general workplace safety. The last of the *Weisbarth* factors—the general subject matter of the speech—also tips towards Romero. Romero raised concerns about whether Middletown was treating and testing the water correctly, and whether Middletown was maintaining a safe work environment. The second and third factors, at least on the surface, weigh towards Defendants. Romero's comments were made while he was on the job. And his audience was generally his supervisors, except for an employee at the OEPA. But, as already explained, those factors are not dispositive here.

In sum, taking the allegations in Romero's Complaint as true, Romero has alleged sufficient facts to give rise to a plausible inference that he spoke on these

issues, both to his superiors and outside the chain of command, as a concerned citizen—to be sure, as a concerned citizen who had "gain[ed] knowledge of matters … through [his] employment[,]" *Lane*, 573 U.S. at 240, but a concerned citizen nonetheless. Thus, his speech is not employee-speech.

### b. Romero Spoke On Matters Of Public Concern.

Much like the analysis on employee/citizen-speech, the framework for deciding whether speech relates to a matter of public concern is "not well defined." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Courts have established guideposts, however. "Speech involves matters of public concern when it can be fairly considered as relating to [1] any matter of political, social, or other concern to the community, or [2] when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241. Conduct does not have to be illegal for it to be a matter of public concern. *Mayhew*, 865 F.3d at 469. And even if the allegations prove to be untrue, the public still has an interest in hearing the accusation. *Mertins*, 2020 WL 3032929, at *3. Like the question of citizen versus employee-speech, whether or not the speech at issue involves a matter of public concern is a question of law for the Court to decide. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008).

Defendants see Romero's speech as simply quibbling about management styles and various departmental policies, which Defendants say are not matters of public concern. They portray Romero's speech to the OEPA as merely criticizing

Middletown's testing procedures, which they say is also not a matter of public concern.

But Defendants' arguments seem strikingly similar to the arguments the Sixth Circuit rejected in *Charvat v. Eastern Ohio Regional Wastewater Authority*, 246 F.3d 607 (6th Cir. 2001). There, the plaintiff raised concerns about violations of environmental regulations. In response, the defendant characterized the concerns as only implicating internal management issues and therefore not a public concern. The Sixth Circuit disagreed, saying, "[c]haracterizing Charvat's speech as regarding only personnel issues and internal operations is disingenuous at best." *Id.* at 617. Charvat's reports about the sewage-treatment facility's violation of several environmental regulations, "when analyzed for their 'content, form, and context,'" were "perfect example[s]" of protected speech "designed to increase the awareness of regulatory violations and potential threats to the public health and safety of the community." *Id.* at 617–18.

Here, much like Charvat, Romero not only raised concerns that Middletown's water treatment plant had violated OEPA regulations on safe water treatment, but also about how Middletown was maintaining the water quality and the safety of their plant. Like Charvat, Romero's comments were designed to increase awareness about the potential regulatory violations. And Defendants' ability to maintain safe drinking water standards would certainly be newsworthy and concerning to the public. *See Lane*, 573 U.S. at 241.

Accepting all factual allegations in Romero's Complaint as true, and drawing all reasonable inferences in Romero's favor, the Court finds that Romero has alleged sufficient facts to survive the Defendants' judgment on the pleadings on his First Amendment retaliatory discharge claim.

## C.   The Individual Defendants Are Not Entitled To Qualified Immunity On Romero's First Amendment Retaliation Claim.

Under the doctrine of qualified immunity, "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Colorez*, 441 F. Supp. 3d at 567 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, in determining whether the individual defendants here (Douglas Adkins, Scott Belcher, Mark Clemons, and Scott Tadych) are entitled to qualified immunity, the Court asks two questions: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* (citing *Phillips v. Roane Cty.*, 534 F.3d 531, 538–39 (6th Cir. 2008)). The Court already answered the first question in the affirmative (at least at the judgment on the pleadings stage).

As for the second question, the individual defendants argue that the right here was not clearly established. Of course, the answer on that front depends to some extent on how the right at issue is described. The individual defendants characterize it as the right to "engage in speech that impedes the government's ability to fulfill its duties and functions." (Defs.' Mot. at #99). Characterized in that manner, the Court

may well agree with them. But, at this stage of the litigation, without discovery, and looking only at the pleadings, in addressing the qualified immunity issue the Court draws all reasonable inferences in Romero's favor as it is required to do. *See Greer v. City of Highland Park*, 884 F.3d 310, 313 n.1 (6th Cir. 2018); *Enoch v. Hogan*, 728 F. App'x 448, 454 (6th Cir. 2018). And the allegations do not suggest that Romero impeded the individual defendants' abilities to fulfill their duties and functions, as they claim, but rather that he was encouraging them to do their jobs better. Thus, the individual defendants' characterization of the right does not (at least currently) work. Rather, the right at issue here is more properly characterized as a public employee's right to be free from retaliation for exercising his or her right to free speech. And "[i]t is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987).

Because, at least for purposes of a judgment on the pleadings, Romero has shown that a constitutional violation occurred, and that the constitutional right at issue was clearly established at the time of Romero's termination, the Court denies the individual defendants' assertion of qualified immunity for Romero's First Amendment claim.

## CONCLUSION

Based on the foregoing, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Judgment on the Pleadings. (Doc. 10). Romero's Ohio law wrongful discharge in violation of public policy claim is **DISMISSED WITHOUT**

**PREJUDICE** to allow him to identify specific public policies and their sources that would meet the clarity element, as discussed above. The Court directs Romero to file any such amended Complaint within twenty-eight (28) days.

      **SO ORDERED.**

August 18, 2020
**DATE**

        **DOUGLAS R. COLE**
        **UNITED STATES DISTRICT JUDGE**