# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MATTHEW B. ROMERO,

       Plaintiff,

                                 **Case No. 1:19-cv-307**

      v.                      **JUDGE DOUGLAS R. COLE**

CITY OF MIDDLETOWN, et al.,

       Defendants.

## OPINION AND ORDER

This cause is before the Court on two motions that grew out of this Court's previous Order, dated August 18, 2020 (Doc. 21), in which the Court granted-in-part and denied-in-part a Motion for Judgment on the Pleadings (Doc. 10) filed by Defendants the City of Middletown, Douglas Adkins, Scott Belcher, Mark Clemons, and Scott Tadych (collectively "Defendants"). In that Order, and as relevant here, the Court dismissed Plaintiff Matthew B. Romero's ("Romero") claim for wrongful discharge—called a "*Greeley* claim" under Ohio law—for failing to articulate a specific public policy that met the requirements necessary to support such a claim. The Court dismissed the claim without prejudice, though, and provided Romero twenty-eight days in which to file an amended complaint, if he could identify an appropriate source of public policy on which to base it. Romero did not file a proposed amended complaint within the specified time, which led to the first motion at issue here, the Defendants' Partial Motion to Dismiss for Failure to Prosecute (Doc. 22). That filing perhaps spurred the second motion—Romero's Motion for Leave to File Amended Complaint

(Doc. 23). After reviewing the briefing for both motions, the Court ordered the parties to file supplemental briefs on whether Romero's renewed *Greeley* claim satisfies a second requirement for such claims, called the jeopardy element. (Doc. 32). Accordingly, the parties each filed one additional brief on that issue. (Docs. 39–40).

For the reasons set forth below, the Court **DENIES** Defendants' Motion to Dismiss for Failure to Prosecute, but also **DENIES** on futility grounds, Romero's Motion for Leave to File an Amended Complaint. The end result of these two determinations is that Romero's *Greeley* claim is now **DISMISSED WITH PREJUDICE**.

## BACKGROUND

The Court recounted the background of this matter at some length in its August 18, 2020 Order, and elects not to repeat that here. (*See* Doc. 10). For purposes of the motions currently before the Court, suffice it to say that Matthew Romero was employed by the City of Middletown in its Water Treatment Division, and he was recently terminated from his position. He claims that the City fired him because of his proclivity to identify—to his supervisors and to the Ohio EPA—safety failings in water-treatment plant operations.

Romero responded by filing a two-count complaint (Doc. 6) in state court, which the Defendants removed to this Court. The first count in his state-court complaint set forth a wrongful discharge claim, asserting that the City wrongfully terminated him in violation of public policy—called a *Greeley* claim, in reference to *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990). In the second count, he alleged retaliatory discharge in violation of the First Amendment.

The Defendants moved for judgment on the pleadings as to both counts. On August 18, 2020, the Court granted that motion, but only as to the first count. More specifically, the Court found that Romero's Complaint lacked the necessary allegations to support a *Greeley* claim. The Court noted that, to successfully allege a *Greeley* claim, a plaintiff must both (1) identify a *clear* public policy manifested in some source of law (e.g., statute, regulation, or common law) (the "clarity element"), and (2) show that failing to provide a cause of action for terminating employees in circumstances such as those the plaintiff in a particular case alleges would *jeopardize* that public policy (the "jeopardy element"). (*See* Doc. 10, #186). (There are also two additional elements that must be shown for a successful *Greeley* claim—causation and overriding justification—but neither of those is necessary to the decision here.)

The Court noted that one source of clear public policy is Ohio's whistleblower statute, which offers general protections to those persons (like Romero claims to be here), who report violations of law. (*Id*. at #188). But that statute does not work for Romero, as it imposes procedural requirements that a plaintiff must meet before bringing a claim—even a *Greeley* claim under that statute—and Romero concedes he did not meet those requirements here. (*Id*.).

Absent the whistleblower statute, a plaintiff must identify some *other* public policy that meets the clarity element for a *Greeley* claim. That showing, this Court also explained, requires two sub-elements. First, to satisfy the clarity element, the policy at issue must be a specific policy arising from a specific legal source (which the Opinion referred to as the "specificity requirement"). (*Id*.). Second, the cited legal

source must parallel Ohio's whistleblower statute. (*Id*.). That is, the cited legal source for the policy must either (1) impose an affirmative duty on employees to report a violation, (2) prohibit employers from retaliating against employees who file complaints on the topic, or (3) be designed to protect the public health and safety. (*Id*. at #189). This is referred to as the "parallelism requirement."

In his original complaint, Romero had offered two potential "public policies" in support of his claim—safe drinking water and workplace safety. As to the first, the Court found that Romero had merely cited an amalgam of statutes and regulations rather than a specific source for a specific policy that the City allegedly violated by terminating him, and thus this policy failed to satisfy the clarity element. (*Id*. at #189–94). As to the proposed "workplace safety" policy, while Romero cited particular statutes, this Court noted that Ohio courts had already considered those statutes, and had found the public policies located therein to be too general to meet the specificity requirement of the clarity element for a *Greeley* claim. (*Id*. at #195).

Because both of the proffered policies failed to satisfy the clarity element, the Court granted the Defendants' Motion for Judgment on the Pleadings as to Count I. But the Court did so without prejudice. Specifically, the Court granted Romero twenty-eight days leave to file an amended complaint addressing, if he could, the deficiencies the Court had identified in his wrongful discharge claim. (*Id*. at #212).

At the end of that twenty-eight-day period, i.e., on September 15, 2020, Romero had yet to file an amended complaint. Accordingly, on September 21, 2020, Defendants filed a motion to dismiss the wrongful discharge claim for lack of

prosecution. (*See* Mot. for Partial Dismissal, Doc. 22). A little more than a week later—and two weeks after the end of the period the Court had specified—on September 29, 2020, Romero filed a motion for leave to file an amended complaint, attaching the proposed Amended Complaint. (*See* Mot. for Leave to File Am. Compl., Doc. 23).

In the motion for leave, Romero abandons his workplace-safety argument. But, he does propose a new specific source of law that, he says, supports a clear public policy in favor of safe drinking water. In particular, he alleges that OAC 3745-81-14 is a specific source for a specific public policy and "is an administrative regulation protecting the public health and safety" and thus suffices as a basis for a *Greeley* claim. (Doc. 23 at #219; *see also* Mem. in Opp. to Mot. for Partial Dismissal, Doc. 24, #242 (asserting that "OAC 3745-81-14 is designed to protect the public safety")). Romero also explains, both in his motion for leave to amend, and in his opposition to the motion to dismiss for failure to prosecute, why his proposed amendment was dilatory. Specifically, Romero claims that, "[a]s a result of the Defendants' misconduct in withholding … evidence until September 21, 2020." (Doc. 24 at #242). Therefore, Romero explains, Defendants prevented him from relying on this regulation until that time.

Defendants, in contrast, request that the Court deny Romero leave to amend, either based on his failure to file the amended complaint within the requisite time (*see generally* Mot. for Partial Dismissal, Doc. 22), or because the proposed amended

complaint fails on the merits, (*see generally* Mem. in Opp. to Mot. for Leave to Am., Doc. 26).

Defendants' Motion for Partial Dismissal for Failure to Prosecute and Romero's Motion for Leave to Amend are both currently before the Court.

## LEGAL STANDARD

At root, the two competing motions involve Romero's request to file an amended complaint. A district court is afforded broad discretion in deciding whether to allow leave to amend a complaint. *See, e.g.*, *Cheryl & Co. v. Krueger*, No. 2:18-cv-1485, 2019 WL 7821056, at *1, (S.D. Ohio Dec. 12, 2019) (citing *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990)). Motions for leave filed after a defendant answers or files a Rule 12 motion are analyzed under Federal Rule of Civil Procedure 15(a)(2), which instructs that leave should be "freely" granted "when justice so requires." Absent "any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies … undue prejudice to the opposing party … futility of the amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). A district court's "outright refusal to grant the leave without any justifying reason … is not an exercise of discretion," but instead an abuse of it that is "inconsistent with the spirit of the Federal Rules." *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (citing *Foman*, 371 U.S. at 182) (quotation omitted).

That being said, one reason a court may exercise its discretion and deny a motion to amend is futility. A motion to amend a complaint is futile "if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Foman*, 371 U.S. at 182); *see also Parchman*, 896 F.3d at 737–38 (same); *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005) (denying leave to amend when the proposed amended pleading consisted of conclusory allegations without factual support). Defendants contend that is the case here.

Defendants also seek to preclude amendment based on Romero's failure to comply with the Court's Order setting a schedule for that amendment, which Defendants characterize as a failure to prosecute. They seek dismissal under Fed. R. Civ. P. 41(b). That rule authorizes the Court "to dismiss an action for failure of a plaintiff to prosecute the claim or to comply with the Rules or any order of the court." *Schafer v. City of Defiance Policy Dep't*, 529 F.3d 731, 736 (6th Cir. 2008). The "measure is available to the district court as a tool to effect 'management of its docket and avoidance of unnecessary burdens on the tax-supported courts [and] opposing parties,'" *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999), a concern that perhaps takes on heightened significance here where one of the parties (i.e., the City) is itself also a "tax-supported" entity. On the other hand, courts should be "reluctant" to uphold the dismissal of a matter as a sanction, as that sanction deprives the plaintiff of his day in court. *Id.*

The Sixth Circuit has identified four factors for courts to consider in balancing these competing concerns: "(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered." *Id.* (citing *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 615 (6th Cir. 1998)).

## LAW AND ANALYSIS

### A.    The Court Denies Defendant's Motion for Partial Dismissal as Moot.

Defendants have two separate paths to achieve their desired outcome here—i.e., dismissal with prejudice of the wrongful discharge claim. The Court could reach that result if (1) the Court grants the Motion to Dismiss for Failure to Prosecute, or (2) the Court denies Romero's Motion for Leave to Amend. As to the former, the Court agrees with Defendants that time limits are important and that Romero clearly exceeded the permissible time limit here. Romero's proposed amended complaint came nearly two weeks outside the window that this Court specified. At the same time, Defendants have not identified any particular harm that they suffered as a result of the two-week delay between the time the Court specified for filing an amended complaint (i.e., September 15, 2020) and the date on which that event actually occurred, September 29, 2020. And, as a general matter, as noted above, it is preferable for courts to decide matters on the merits, rather than on procedural grounds.

How those countervailing considerations would play out is an interesting question, but one the Court concludes it need not reach here. That is because the Court finds that, even considering Romero's proposed amended complaint on the merits, the amendment is futile. The public policy that Romero cites still does not satisfy the requirements that Ohio courts have identified as the necessary minimum for a *Greeley* claim. Accordingly, as more fully explained below, the Court **DENIES** Romero's Motion for Leave to Amend (Doc. 22), and thus also **DENIES** the Defendants' Motion for Partial Dismissal (Doc. 23) as **MOOT**, the end result of which is that the Court **DISMISSES** the wrongful discharge claim **WITH PREJUDICE**.

**A.    The Court Denies Romero's Motion for Leave to File an Amended Complaint.**

   **1.    *General Principles.***

The general rule in Ohio is that employment, including employment with state or local government bodies, is governed by the at-will doctrine. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529 (Ohio 2002). *Greeley* creates a narrow exception to that rule that covers employees who are terminated in violation of public policy. *Miracle v. Ohio Dep't of Veterans Servs.*, 137 N.E.3d 1110, 1113 (Ohio 2019) (citing *Greeley*, 551 N.E.2d at 981)).

But not just any public policy will do. Consistent with ensuring that the exception does not swallow the rule, Ohio courts require plaintiffs to identify public policies that meet certain strictures before plaintiffs can rely on those policies as the basis for a *Greeley* claim. As relevant here, and as described above, the cited public policy must meet both the clarity element and the jeopardy element.

The first of those —the clarity element—requires a showing, as also discussed above, both that (1) the policy is specifically set forth in a specific legal source, (the "specificity requirement"), and (2) that, if the source of the public policy is not Ohio's whistleblower statute, that the source of the public policy exhibits a "parallelism" with the whistleblower statute, (the "parallelism requirement"). *See Hale v. Mercy Health Partners*, 617 F. App'x 395, 403 (6th Cir. 2015) (citing *Dean v. Consol. Equities Realty #3, L.L.C.*, 914 N.E.2d 1109, 1112 (Ohio Ct. App. 2009)). To establish "parallelism" with the whistleblower statute, the plaintiff must show that the legal source the plaintiff cites for the public-policy claim either (1) imposes an affirmative duty on employees to report a violation; (2) prohibits employers from retaliating against employees who file complaints on the topic; or (3) is designed to protect the public's health and safety. *Id.*

The jeopardy element, on the other hand, asks whether "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." *Miracle*, 137 N.E.3d at 1113. In conducting that inquiry, the Court must:

> (1) determine what kind of conduct is necessary to further the public policy at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir. 2020) (citing *Himmel* v. *Ford Motor Co.*, 342 F.3d 593, 599 (2003)). Additionally, the employee must have given the employer clear notice "that he is invoking a governmental policy as the basis for his

complaint, not just his own self-interest." *Id.* (quoting *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 659 (6th Cir. 2005)).

The jeopardy analysis also involves an inquiry "into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim." *Shingler v. Provider Servs. Holdings, L.L.C.*, No. 106383, 2018 WL 3414268, ¶ 22 (Ohio Ct. App. 2018). The Ohio Supreme Court in *Wiles*, explained it like this:

> If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy. Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

773 N.E.2d at 531 (quotation omitted). That is, as a general matter, a plaintiff cannot use a statute or regulation as the basis for a wrongful discharge claim under *Greeley*, if the statute or regulation contains its own penalty provisions.

### 2. *Romero Satisfies the Clarity Element of His* Greeley *Claim.*

In his proposed Amended Complaint, Romero now claims that the specific legal source for the public policy at issue is OAC 3745-81-14. This regulation establishes "maximum contaminant levels for microbiological contaminants" in a "public water system." *Id*. According to Romero, the regulation "manifests a statewide public policy protecting the public from contaminated drinking water supplies," and, in support of this policy, "prohibit[s] termination of employees such as Mr. Romero for contacting the OEPA concerning water treatment disinfections practices affecting public health or safety." (Am. Compl., #233, ¶ 36).

At this juncture, then, the question is whether this proposed public policy meets the clarity and jeopardy elements. Start with clarity. Romero appears to meet the specificity requirement of the clarity element. He has identified a specific legal source, which sets forth a specific public policy in favor of water that is free from microbiological contaminants. That suffices for pleading purposes.

The parallelism requirement of the clarity element is perhaps a closer call, but the Court would agree it is met, at least for pleading purposes. In particular, the regulation Romero cites at least arguably appears "designed to protect the public's health and safety," which is one way to show parallelism under Ohio law.[1]

As the cited regulation appears to satisfy both specificity and parallelism, Romero arguably meets the clarity element, at least for pleading purposes, precluding a finding of futility on that score. *Hale*, 617 F. App'x at 403.

### 3. *Romero Fails to Satisfy the Jeopardy Element of His* Greeley *Claim.*

Apart from the clarity element, though, the cited public policy must also meet the jeopardy element, and jeopardy, like clarity, is a purely legal question. *Collins v. Rizkana*, 652 N.E.2d 653, 658 (Ohio 1995). Moreover, courts must take the jeopardy element seriously. Doing so is an important aspect of ensuring that *Greeley* claims

---

[1] On its face, the regulation also appears to require the city to "[r]eport [any] violation to the director [of the Ohio EPA] no later than the end of the next business day after the public water system learns of the violation." OAC 3745-81-14(G). One could perhaps argue that this is a "reporting requirement," and thus satisfies the parallelism requirement under the first prong of the test. There are two problems with that, though: (1) that reporting provision expired on March 31, 2016; and (2) this reporting requirement applies to the employer, not the employee. Given the Court's conclusion above, though, as to the third prong of the parallelism test, the Court need not resolve that issue.

remain the exception, not the rule. Absent the jeopardy requirement, every governmental regulation that could be characterized as promoting public safety—which is a lot of them—ostensibly would give rise to a *Greeley* claim. That is not what the Ohio Supreme Court intends. And, unfortunately for Romero, the regulation he cites in his proposed amended complaint falls short on the jeopardy front.

As noted above, the jeopardy element requires the Court to consider whether the cited public policy contains its own remedy mechanisms to ensure compliance, such that a wrongful termination cause of action is not necessary to achieve the articulated public policy goal. *Wiles,* 773 N.E.2d at 531. That certainly appears to be the case here. The regulation Romero cites, OAC 3745-81-14, is one aspect of Ohio's "Primary Drinking Water Rules." Those rules contain their own penalty provisions. In particular, OAC 3745-81-04 sets forth "administrative penalties" that apply to any violations of the Primary Drinking Water Rules, including violations of OAC 3745-81-14. The Ohio EPA adopted that penalty provision pursuant to O.R.C. § 6109.23, which specifically authorizes the director of environmental protection to adopt "monetary penalties for failure to comply" with Ohio's safe drinking water statutes and rules.

Nor are the administrative penalties the only enforcement mechanism in play. That same statute, O.R.C. § 6109.23, specifically provides that the administrative penalties will be *in addition to* the director's civil and criminal enforcement powers. *Id.* And those civil and criminal enforcement powers are also implicated here. That is because O.R.C. § 6109.31 provides that no person shall violate Chapter 69 (entitled

"Safe Drinking Water"), or any "rule adopted under it." The latter category would include the rule that Romero cites here. If a person violates O.R.C. § 6109.31—for example, by violating the administrative code provision Romero cites—that person then faces both: (1) "a civil penalty of not more than twenty-five thousand dollars for each violation," O.R.C. § 6109.33; and (2) the possibility of a criminal charge that carries potential penalties of a ten thousand dollar fine and "not more than four years" of imprisonment, O.R.C. § 6109.99. The express inclusion of these "alternative means of promoting the particular public policy" at issue, *see Shingler*, 2018 WL 3414268 at *5, suggests that this public policy does not meet the jeopardy element.

Romero argues to the contrary, noting that OAC 3745-81-14 "provides no personal remedy to protect employees such as [himself] who report violations." (Romero's Suppl. Br., Doc 40, #1293). Based on that fact, Romero contends that "dismissing employees under circumstances like those involved in [Romero's] dismissal would jeopardize the public policy expressed in" OAC 3745-81-14. (*Id.* at #1292 (quotation omitted)). In short, Romero seems to suggest that if the alternative enforcement means does not provide a remedy to the employee him or herself, (i.e., some type of private right of action for wrongful termination), then that alternative enforcement means does not "count" for purposes of assessing the jeopardy element.

A key problem for Romero, though, is that the Ohio Supreme Court's opinion in *House v. Iacovelli*, 152 N.E.3d 178 (Ohio 2020), forecloses his argument. There, the employee worked at a restaurant, whose owner allegedly underreported the employee's income to the state. The employee complained to the owner, noting that

14

the effect of the underreporting was that the employee would "receive less unemployment compensation than what she would have been entitled to otherwise receive." *Id.* at 180. Shortly thereafter, the restaurant terminated the employee, who then brought a *Greeley* claim alleging the employer had violated provisions in O.R.C. Chapter 4141, which requires employers to accurately report employees' pay and tips to the Bureau of Unemployment Compensation.

The Ohio Supreme Court concluded that the employee had failed to satisfy the jeopardy element of her *Greeley* claim. According to the Court, after reviewing O.R.C. Chapter 4141, it was apparent that the General Assembly had "provided remedies that discourage employers from inaccurately reporting employees' pay and tips to the Bureau of Unemployment Compensation (violating R.C. Chapter 4141) and that [those remedies suffice to] punish employers who fail to comply with the requirements in R.C. Chapter 4141." *Id.* at 182. These included penalties that provided for forfeiture and potentially civil action, fines and criminal liability

The employee nonetheless argued that those remedies were "insufficient to protect her or society's interests and to discourage wrongful conduct" because there was "no personal remedy to protect employees who were dismissed after informing their employees of R.C. Chapter 4141 violations." *Id.* at 182. The Court disagreed. It reasoned that the existing remedies available under O.R.C. Chapter 4141 made a personal remedy unnecessary "to discourage wrongful conduct by employers" and that the remedies were "sufficient to protect society's interest in the public policy that

employers should accurately report employees' pay and tips to the Bureau of Unemployment Compensation." *Id.* at 182–83.

To be sure, the Court acknowledged that it had "previously looked to see whether a statutory scheme contains a sufficient personal remedy for the aggrieved employee." *Id.* at 183. But the Court noted a key distinction between those cases and the one before it. The former had "involved public policies that protect[ed] substantial rights *of the employee*." *Id.* (emphasis added) (citing *Wiles*, N.E.2d 526, at ¶ 17 (Family and Medical Leave Act, 29 U.S.C. 2601 et seq.); *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308 (1997) (Occupational Safety and Health Act ("OSHA")); *Pytlinski v. Brocar Prods., Inc.*, , 760 N.E.2d 385 (2002) (OSHA); *Leininger v. Pioneer Natl. Latex*, 875 N.E.2d 36 (2007) (age discrimination); *Collins*, 73 Ohio 652 N.E.2d 653 (sexual harassment and discrimination); and *Bickers v. W. & S. Life Ins. Co.*, 879 N.E.2d 201 (Ohio 2007) (workers' compensation)). The case currently before it, on the other hand, involved no such personal right. "Instead, the public policy announced in [that] case protect[ed] a particular government interest: the accurate reporting of employees' wages to the Bureau of Unemployment Compensation." *House*, 152 N.E.3d at 183. In other words, where the public policy at issue is directed at protecting individual employees (e.g., discrimination claims of various types, or workplace safety claims), then it makes sense that some form of employee-specific remedy may be necessary to effectuate that public policy. But where the public policy at issue (e.g., safe drinking water) is not employee specific, but rather runs to the general public, the "alternative means" for protecting that interest likewise need not be employee specific.

In fact, the Ohio Supreme Court recognized that, where the public policy at issue is not employee specific, an employee-specific remedy—like wrongful discharge—may not ultimately serve to protect that policy. For example, recognizing a wrongful discharge claim in *House* would "only discourage retaliation, i.e., termination, for confronting [the employer] about their failure to accurately report [the employee's] wages." *Id*. at 471. But "the [employer] could still decide not to pay into the unemployment-compensation fund, and the issue of the [employer's] failure to comply with R.C. Chapter 4141 would still not be resolved." *Id*. Rather, "the mechanism protecting the public policy in [that] case [was] the statutory scheme enacted by the General Assembly," consisting of administrative penalties among other remedies. *Id*. at 471–72.

The Court's analysis of the issue here builds squarely on *House*'s foundation. As in *House*, a panoply of potential remedies, including monetary, civil, and criminal penalties, sufficiently protect the public policy at issue here. Bolstering that conclusion is the fact that the public policy at issue here—safe drinking water—is not directed at individual employees, but rather to the public at large. As in *House*, then, a personal remedy would only prevent Defendants from retaliating against (i.e., terminating) employees who blow the whistle. It would not significantly promote the broader public interest in safe drinking water that the policy implicates. The mechanism for accomplishing the latter goal, as in in *House*, is "the statutory scheme enacted by the General Assembly, which is specifically aimed at ensuring that all employers comply with their statutory duties." *Id*. at 182; *see also Kaminski v. Metal*

*Wire Prods. Co.*, 927 N.E.2d 1066, 1080 (Ohio 2010) ("[I]t is not the role of the courts to establish their own legislative policies or to second-guess the policy choices made by the General Assembly"). "Had the General Assembly wished to create substantive rights for the employee in this case, it could have done so." *House*, 152 N.E.3d at 184.[2]

Accordingly, as a matter of law, the regulation that Romero cites fails to satisfy the jeopardy element needed for a *Greeley* claim. And, because the proposed Amended Complaint fails as a matter of law, it would be futile for Romero to file it.

---

[2] There is another potential jeopardy problem with Romero's *Greeley* claim that is specific to the facts of this case. As mentioned above, the jeopardy element asks whether "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." *Miracle*, 137 N.E.3d at 1113. But that can only happen if "the employee's actual conduct fell within the scope of conduct protected by [the] policy." *Allman*, 967 F.3d at 574; *Himmel*, 342 F.3d at 599; *Hale*, 617 F. App'x at 403 ; *Avery v. Joint Memorial Hosp.*, 286 F. App'x 256, 264 (6th Cir. 2008). That limitation poses a problem for Romero because it is far from clear that the conduct for which he claims he was fired—reporting that Middletown had been incorrectly preparing "4 Log reports"—is conduct that falls under OAC 3745-81-14. (Am. Compl., Doc.23-1, #233, ¶ 35–36). According to Romero, these 4 Log reports "recor[d] disinfection contact time for the water processed through the treatment plant," and are an important measure of water-quality safety. (*See id.* at #226, ¶ 17). But it is unclear how (if at all) OAC 3745-81-14 relates to 4 Log reporting. The regulation prescribes maximum contaminant levels of "total coliforms" for public water systems. 4 Log reports are not mentioned anywhere on the face of the regulation, Romero does not explain what relationship (if any) 4 Log reporting has with OAC 3745-81-14, and Defendants vigorously dispute that any such relationship exists. (*See, e.g.*, Defendants' Suppl. Br., Doc. 39, #1281 ("The fact remains that coliform and E. coli testing addressed in O.A.C. 3745-81-14 does not refer or relate to 4-Log reporting.")). On the other hand, the regulation calls for samples "collected in accordance with rules 3745-81-50 to 3745-81-55." OAC 3745-81-14(D). And OAC 3745-81-50(B), in turn, requires each public water system to develop a written sample siting plan that calls for "[r]outine and repeat sample sites and any sampling points necessary to meet rules 3745-81-41 to 3745-81-44." Then, OAC 3745-81-41 requires "compliance monitoring" "as described in OAC 3745-81-43." And, finally, that provision requires such monitoring using 4 log testing. So perhaps Romero is indirectly referencing 4 log reporting requirements through OAC 3745-81-14, though it is hard to know because he does not say. In any event, the Court need not definitively resolve the outcome of this labyrinthine trip through the Ohio environmental regulations. That is because, as explained above, the Court concludes that Romero's *Greeley* claim fails to satisfy the jeopardy element for a reason completely independent from this one.

## CONCLUSION

Based on the foregoing, the Court **DENIES**, on futility grounds, Romero's Motion for Leave to File an Amended Complaint (Doc. 23). Given the Court's denial of that motion, the Court also **DENIES**, on mootness grounds, Defendants' Motion to Dismiss for Failure to Prosecute (Doc. 22). As a result of these denials, the *Greeley* claim is **DISMISSED WITH PREJUDICE**. This action shall proceed on the remaining count in the existing Complaint.


**SO ORDERED.**


January 29, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**