# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**MATTHEW B. ROMERO,**

      **Plaintiff,**

                           **Case No. 1:19-cv-307**

      **v.**                     **JUDGE DOUGLAS R. COLE**

**CITY OF MIDDLETOWN, *et al.*,**

      **Defendants.**

## OPINION AND ORDER

This cause comes before the Court on Defendants City of Middletown ("Middletown" or the "City"), Douglas Adkins, Scott Belcher, Mark Clemons, and Scott Tadych's (collectively "Defendants") Motion for Summary Judgment (Doc. 43), filed on June 22, 2021. Plaintiff Matthew Romero filed his Opposition (Doc. 48) on August 6, 2021, and Defendants filed their Reply (Doc. 63) on September 2, 2021.

For the reasons stated more fully below, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. 43).

## BACKGROUND

Romero is a former employee of the City's Water Treatment Division. From 2005 to 2010, Romero worked as a Treatment Plant Operator at Middletown's Water Treatment Plant ("Plant"). (Mot., Doc. 43, #1317). From 2010 to 2014, Romero worked as a Process Control Supervisor. (*Id.*). Process Control Supervisor was a management position. Romero's duties in that position included supervising treatment plant operators, lab analysts, and assistant lab analysts; training new treatment plant

operators and lab staff; and communicating approved operational practices to Plant staff. (Doc. 27-1, #308–09).

Romero voluntarily retired from the Water Treatment Division in March 2014. (Doc. 43, #1317). But about two months later, he applied for the part-time position of Assistant Lab Analyst—and the city hired him. (*Id.*). Although the parties do not say what led to this back and forth, the Court assumes that Romero retired in order to start drawing his pension and then sought re-employment in another public position (here with the same employer)—a practice sometimes referred to as "double dipping." *See Sherman v. Ohio Pub. Emps. Ret. Sys.*, 163 Ohio St. 3d 258, 260–61 (2020) (discussing meaning of "double dipping" as applied to public employees).[1]

As an Assistant Lab Analyst, Romero's new duties differed significantly from those of his former job. His role as a Process Control Supervisor had been a management position, while an Assistant Lab Analyst played a more junior role. In this new role, Romero's responsibilities included "(1) assist[ing] in the training of treatment plant operators for OEPA [(Ohio Environmental Protection Agency)] laboratory certification; (2) collect[ing] and analyz[ing] plant tap and distribution system samples under the direction of the laboratory analyst and Process Control Supervisor; (3) assist[ing] in laboratory instrumentation calibrations; (4) [conducting] coliform bacteria sample collection and testing; and (5) [conducting] treatment chemical residual testing." (*Id.* (citing Doc. 27-1, #301–02)). Romero held

---

[1] While "double dipping" carries a negative connotation in some contexts, Ohio courts have observed that "[i]n Ohio, there is no general policy of discouraging [double dipping]" in the public-employment setting. *Sherman v. Ohio Pub. Emps. Ret. Sys.*, 129 N.E.3d 974, 981 (Ohio App. 2019) (*aff'd*, 163 Ohio St. 3d 258).

the Assistant Lab Analyst position for about two and a half years, from his re-hiring in March 2014 until his termination in October 2016. (*Id.*; Opp'n, Doc. 48, #1383).

Why the city fired Romero is the central dispute here. And on that question, the parties—unsurprisingly—have many disagreements. They appear to agree, however, that Romero's firing did not result from a single event or incident. Rather, in their briefs, both sides describe a long and rather complicated factual background, where his firing was the culmination of multiple incidents that took place over many months. The Court describes each of those incidents—and their fallout—below.

## A. Romero Shuts Down The $CO_2$ Tank.

In spring 2015, Romero discovered that an alarm light had triggered on one of the Plant's $CO_2$ tanks. (Doc. 43, #1317). Although Romero was not responsible for the $CO_2$ tank as an Assistant Lab Analyst, he still inspected the tank, shut it down, and ordered more $CO_2$ for the plant. (*Id.* at #1318). Romero explains that, had he not done so, there was a risk that the tank would have ruptured and exploded—placing anyone working nearby at risk of serious injury. (Doc. 48, #1370).

## B. Romero Complains About Operators.

In early 2016, Romero began complaining to Mark Clemons, who had replaced Romero as Process Control Supervisor, and Scott Belcher, Middletown's Water Treatment Manager. He told them the Plant's "operators were lacking management direction and training, and were unaware of fluoride, chlorine, hardness, and alkalinity targets and lime feed rates." (Doc. 48, #1370–71; *see also* Doc. 43, #1318).

Belcher responded by informing Romero that managing the Plant's operators was not part of his responsibilities as an Assistant Lab Analyst. (Doc. 48, #1371).

## C. Romero Orders More Lime.

In May 2016, a plant operator informed Romero that the Plant's lime storage levels were low and could be depleted before the next scheduled delivery. (Romero Dep., Doc. 36, #1075). The Plant operator in question was uncomfortable ordering more lime because he believed doing so was Clemons' responsibility. (*Id.*). After unsuccessfully attempting to contact Clemons, Romero then called the Plant's lime supplier. (*Id.* at #1075–76). The supplier informed Romero that no new deliveries were scheduled for a few days. (*Id.* at #1076). Romero placed an emergency lime order and scheduled extra deliveries moving forward for the next several weeks. (*Id.* at #1076–77). Romero subsequently emailed Clemons to inform him of the extra deliveries. (Doc. 50-1, #1650). Clemons responded that he already ordered extra lime deliveries. (*Id.*). Romero responded that "[n]o one [he] spoke to yesterday knew anything about extra deliveries or an increase in the delivery schedule. To have allowed the storage at this plant to drop to this level is simple negligence." (*Id.*). How Clemons responded to Romero's criticism is unclear from either side's briefs.

## D. Romero Contacts The OEPA.

In June 2016, Romero became concerned that the Water Division was miscalculating the data it was entering in its 4 Log Reports. (Doc. 36, #1108). The 4 Log Reports "record the disinfectant contact time … applied to inactivate and remove bacteria and viruses in the drinking water, and must be sent monthly to the OEPA."

4

(Doc. 48, #1372; *see also* Doc. 43, #1320). As an Assistant Lab Analyst, Romero was not responsible for the 4 Log Reports. (Doc. 36, #1108). But Romero was concerned that the miscalculations were causing the Water Division to miss its required "contact time," meaning the City was not effectively disinfecting its water. (*Id.* at #1108–10). Romero reported these concerns to Belcher and Clemons, who told him that the Water Division's manner of calculating data in the 4 Log Report complied with instructions they had received from the OEPA. (*Id.* at #1113).

Romero did not find Belcher and Clemons' explanation convincing, given that it seemed to contradict information the OEPA provided in a guidance document on calculating the 4 Log Report. (*Id.* at #1112–13). Romero contacted the OEPA personally. On June 30, 2016, he emailed Dan Cloyd, the City's contact at the OEPA. (Doc. 50-1, #1652). In that email, Romero stated: "I am interested in how we calculate our [contact time] factor for our monthly report here at the Middletown water treatment facility. Is the current guidance document wrong, or are different plants being directed to collect data differently?" (*Id.*).

Romero received an automated response from Cloyd saying he was on extended leave. (Doc. 36, #1112). That automated response provided the contact information, however, for Jeff Davidson, the OEPA's supervisor of drinking water, whom Romero then called. (*Id.* at #1115). During that call, Davidson explained to Romero how the OEPA expected treatment plants to collect data for the 4 Log Reports. (*Id.* at #1116–17). Davidson's explanation reinforced Romero's belief that the Water Division was improperly calculating its data. (*Id.*). After that call, Romero planned to communicate

5

the information he learned from Davidson to the Middletown's Plant management. (*Id.* at #1118). Before he could do so, however, Romero stated during his Deposition that he "got an e-mail from [Belcher] so … [he] didn't pass the information along. [Belcher] said that it wasn't [Romero's] job or concern, that he was taking care of it and he would be responsible." (*Id.*). Romero stopped pursuing the issue. (*Id.* at #1118–19).

### E. Romero Asks About Test Result Notifications.

Between July 28 and August 3, 2016, Romero and Clemons exchanged emails about the results of lead and copper testing the Water Division had conducted at certain residences that summer. (*Id.* at #1090–91). Romero had limited involvement with these tests—although he had helped collect samples from residences that summer, he was neither responsible for testing the samples he collected nor notifying residents of the test results. (*Id.* at #1092, 1130). But on July 28, Romero emailed Clemons, stating that a resident had called asking for his residence's test results. (Doc. 50-1, #1654). Romero asked Clemons when the residents could expect written notification of their test results. (*Id.*). Clemons answered that he would send "all results when all the sampling [was] completed." (*Id.*). Romero then responded that he "believe[d] [the Water Division] ha[s] a 30 day window from when [the Water Division] receive[s] the lab results to notify residents." (*Id.*). Clemons answered that "that is correct," and stated that he was "printing letters today to send residents." (*Id.* at #1655).

6

**F.     Romero Meets With Management.**

On August 3, the same day that Romero reminded Clemons of the 30-day notification requirement and Clemons confirmed that the notifications were printing, Belcher instructed Romero to meet with him and Clemons to discuss Romero's previous communications with the OEPA about the 4 Log reports. (Mot., Doc. 43, #1321; Opp'n, Doc. 48, #1374). That meeting occurred the next day, on August 4, 2016; along with Romero, Belcher, and Clemons, Michael Gillespie—an operator at the Plant—also attended on Romero's request. (Doc. 48, #1374).

Although everyone appears to agree that a major focus of the meeting was Romero's communications with the OEPA, the parties dispute exactly what was said. In an affidavit, Belcher states that he and Clemons told Romero that, although he had the right to contact the OEPA to report a violation or something he felt was not in compliance, Romero was told not to call "the OEPA on City time, using City resources, for help understanding the 4 Log reports because that is not within his duties and responsibilities for the City." (Doc. 27-1, #296). Romero described the meeting slightly differently during his deposition, stating that, although Belcher and Clemons said he could contact the OEPA to report a violation, "it had to be a major violation with immediate public health risk." (Doc. 36, #1154–55). Different still is Gillespie's description of the meeting—provided in an affidavit—in which he states that "Belcher repeatedly instructed Mr. Romero that he was never to call the Ohio EPA for any reason, no matter what." (Doc. 48-2, #1394).

On August 15, 2016, Belcher sent Romero a memo under the subject heading "Call to OEPA." (Doc. 59-1, #2288). In that memo, Belcher "clarif[ied] two key points"

7

from the August 4 meeting: (1) "according to statute, it is … [Romero's] right to call OEPA to report a violation or something he feels is not in compliance;" and (2) "calling the OEPA for help in understanding the 4 Log MOR is not part of [Romero's] job duties and responsibilities with the City of Middletown." (*Id.*). That memo also scheduled another meeting between Romero and management for that same day. This time, along with Belcher and Clemons, Scott Tadych—Middletown's Public Works and Utilities Director—also attended. (Doc. 48, #1376).

Again, the parties dispute what was said during this meeting. According to Belcher's affidavit, Belcher, Clemons, and Tadych again explained to Romero that he had a right to contact the OEPA to report violations or noncompliance. (Doc. 27-1, #296). But they expressed their concern that Romero was focusing on the job responsibilities of others, rather than his own. (*Id.*). Belcher also states that Romero resisted these instructions and responded that he would not "go around the plant with blinders on." (*Id.*).

Romero described it differently during his deposition. According to Romero, Belcher "went over again how … calling the EPA on the 4-log report was something [he] shouldn't have done, [and he] … could only call the EPA for major violations, and that [he] was not to call the EPA except for things that [were] directly related to [his] job duties." (Doc. 36, #1157). Romero agrees, however, that he resisted Belcher, Clemons, and Tadych's instructions during this meeting, stating during his deposition that "[i]t didn't make sense to [him] that [Belcher] was telling [him] that

… [he] could not call the EPA except for things that were specifically [his] assigned job duties from [his] job description." (*Id.* at #1158).

The next day, August 16, 2016, Tadych issued a memorandum purporting the summarize the August 15 meeting. (Doc. 35, #986). In that memorandum, Tadych reiterated that Romero could contact the OEPA to report a violation or non-compliance, but requested that Romero notify management before doing so. (*Id.*). Tadych reiterated that Romero should focus on his own job duties. As for Romero's resistance to these instructions, Tadych asked that Romero "reconsider [his] position." (*Id.*). As Tadych explained, "[f]ailure to perform your job duties and responsibilities and work as defined by your job description and required by your supervisor in addition to violations of the City's Policies and Procedures will result in disciplinary action up to and including termination." (*Id.*). Romero responded, promising not to "bypass the chain of command for violations or non-compliance issues, major or minor," however, Romero maintained that he had " both a right and a responsibility to call the OEPA about guidance documents issued by the OEPA concerning drinking water when [he didn't] understand them." (*Id.* at #987).

On August 16, 2016, Belcher called Mariano Haensel and Dave Reilly, OEPA employees. (Doc. 27-1, #296). He reports that they confirmed that "Plaintiff is expected to report any violation or non-compliance of which he becomes aware." (*Id.*). Apparently, they added that "they were familiar with Plaintiff and informed [Belcher] that [Plaintiff] was involving himself in things that were no longer part of his job, which was becoming a problem." (*Id.*). And "[t]hey further stated that Plaintiff should

not have called them for help understanding how a 4 Log report is being done by the current Process Control Supervisor, and explained that they are not teachers and there are guidance documents available." (*Id.*).

On September 27, 2016, Romero emailed Scott Belcher asking if he had consulted the City's legal personnel regarding his "ability to speak with the OEPA about water issues." (Doc. 59-1, #2292). Belcher expressed some confusion regarding Romero's inquiry, responding that he "thought [Romero] understood the two points [from the last meeting] and that no further action was needed." (Doc. 59-1, #2291). Belcher then said he would schedule another meeting. (*Id.*). Romero responded that Belcher "said [he] would check the two points of the last meeting … with [City Attorney] Les Landon." (*Id.*). Romero added that he did "not need another meeting … if [Belcher] ha[d] not done this as [he] said [he] would." (*Id.*).

Still, Belcher, Clemons, and Tadych held another meeting with Romero on September 29, 2016. At Romero's request, one of the Plant's secretaries sat in and took minutes. During that meeting, Belcher, Clemons, and Tadych repeated that Romero had "a right to call the EPA with questions/concerns regarding any violations," however, he "did not have any right to call the EPA over any issues that are not directly related to his job." (Doc. 27-1, #312).

Tadych, Belcher, and Romero held another meeting on October 13, 2016. According to the meeting minutes, Belcher again reiterated that Romero could contact the OEPA to report violations, but he was "not to venture into other job duties." (Doc. 50-1, #1659). When Romero asked for examples of what this meant,

10

Belcher responded that Romero was "not allowed to monitor operations, do rounds at the Plant or check the lime store tank level." (*Id.*). Romero "again asked how [he did] that." (*Id.*). Belcher "said there were several instances," such as "questioning the 4 log removal report," which were "not within [Romero's] job." (*Id.*). Romero responded that "he would do it again … [he] would go over there, right now and call the EPA." (*Id.*). Belcher also said he had heard rumors that Romero had criticized management. (*Id.*). Romero responded that he did not listen to rumors. (*Id.*). At that point, Tadych told Romero he was recommending his termination for insubordination. (*Id.*).

On October 14, 2016, Douglas Adkins—Middletown's City Manager—acted on that recommendation and fired Romero. (Doc. 48, #1383).

## G. Procedural History

On March 27, 2019, Romero filed the instant Complaint in the Butler County Court of Common Pleas. (Doc. 6, #56). In that Complaint, he brought two claims against the City, Adkins, Belcher, Clemons, and Tadych: (1) a claim for wrongful discharge in violation of public policy under Ohio law, and (2) a First Amendment retaliation claim under 42 U.S.C. § 1983. (*Id.* at #68–71). The Defendants removed on federal question grounds. *See* 28 U.S.C. § 1331. This Court then dismissed the wrongful discharge claim on August 18, 2020, in response to Defendants' Motion for Judgment on the Pleadings, leaving only Romero's First Amendment retaliation claim. (Doc. 21).

On June 22, 2021, Defendants filed this Motion for Summary Judgment. (Doc. 43). Romero filed his Opposition on August 6, 2021 (Doc. 48), and Defendants filed their Reply on September 2, 2021 (Doc. 63).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must establish that there are no genuine disputes of material fact, which may be accomplished by showing that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).

But as the Sixth Circuit has explained, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would warrant submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

The First Amendment guarantees freedom of expression and prohibits Congress, and—by incorporation—state actors, from restricting the rights of individuals to speak freely. U.S. Const. amend. I; *see Gitlow v. People of State of N.Y.*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment). The First Amendment protects the speech rights of a public employee. As relevant here, a public employer cannot retaliate against an employee based on the employee's exercise of his or her First Amendment rights.

To establish a prima facie case on a First Amendment retaliation claim, a plaintiff must show that:

1. he was engaged in a constitutionally protected activity;
2. he was subjected to adverse action or deprived of some benefit; and
3. the protected speech was a "substantial" or "motivating factor" in the adverse action.

*Haddad v. Gregg*, 910 F.3d 237, 243 (6th Cir. 2018) (citing *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). Functionally, this test also has a step zero— "requiring the plaintiff to identify the 'speech' at issue." *Denhof v. Dolan*, No. 1:02-cv-275, 2004 WL 7344760, at *6 (W.D. Mich. Sept. 27, 2004).

13

"If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)) (quotations marks omitted). "Once this shift has occurred, summary judgment [in the defendant's favor] is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.*

Here, neither side disputes that Romero's firing constitutes an adverse action, satisfying the second element of his prima facie case. Thus, the Court is left with three questions. First, the Court must answer step zero—whether Romero engaged in speech, and what that speech was. Then, the Court must answer steps one and three—whether the First Amendment protects the speech identified at step zero, and whether that speech was a substantial factor in his termination. As to each, to move beyond summary judgment, Romero must establish, at least, a genuine dispute of material fact. The Court addresses each factor in turn.

Separately, Defendants claim that, even if there is a constitutional violation, qualified immunity prevents liability here. Although the Court rejected qualified immunity at the judgment on the pleadings stage, the further factual development that has occurred since then requires a reexamination of that issue. Thus, the Court turns to that topic after addressing the merits of the First Amendment claim.

**A.    Romero Makes A Prima Facie Case On His First Amendment Retaliation Claim.**

**1.    Romero Engaged In Speech.**

"It is axiomatic that a threshold question the Court must ask when conducting a First Amendment analysis is whether the [state action] regulates 'speech' within the meaning of the First Amendment such that it is protected by the First Amendment in the first place. Such 'speech' can take the form of expressive conduct." *Knight v. Montgomery County*, 592 F. Supp. 3d 651, 659 (M.D. Tenn. 2022), *appeal dismissed sub nom.*, No. 22-5249, 2022 WL 2348094 (6th Cir. May 11, 2022) (citing *Rumsfeld v. Forum for Acad. and Instit. Rights, Inc.*, 547 U.S. 47, 66 (2006)). But, obviously, it cannot take the form of *non-expressive* conduct.

To determine whether Romero has stated a First Amendment retaliation claim that can make it to a jury, the Court must start by determining what speech, exactly, is at issue.

But neither side's briefs clarify the specific incidents of speech on which the Court should focus. Romero describes a series of events taking place over several months, which he appears to allege either individually or collectively amounted to his unlawful termination in retaliation for his speech. Defendants respond that none of these events, even when viewed collectively, support Romero's retaliation claim. But to conduct a First Amendment retaliation analysis, the Court cannot consider these events in the abstract. Rather, the Court must specifically enumerate what incidents are at issue and whether any of these incidents contained some element of speech.

15

In reviewing the facts in the record, the Court has identified five key incidents that Romero alleges ultimately led to his termination: (1) Romero inspecting and shutting down the plant's $CO_2$ tank and ordering more $CO_2$ in spring 2015; (2) Romero speaking to Belcher and Clemons about his concern that the Plant operators were not properly trained; (3) Romero ordering lime and accusing his supervisors of negligence for allowing the Plant to deplete its lime supply in May 2016; (4) Romero contacting the OEPA in early summer 2016 to discuss the 4 Log reports; and (5) Romero emailing Clemons on August 3, 2016 to remind him of the Department's obligation to send water test notifications to residents on a timely basis.

Some of these incidents include some element of speech on Romero's part. For example, Romero engaged in speech when he expressed concerns to Belcher and Clemons that the Plant's operators were not properly trained. Similarly, the incidents where Romero contacted the OEPA to discuss the 4 Log reports and later reminded Clemons of the Department's obligations to send test notifications also contained an element of speech.

The remaining incidents, however, are harder. Start with the first incident— Romero inspecting and shutting down the plant's $CO_2$ tank and ordering more $CO_2$. As far as the Court can tell, this incident was characterized by Romero's non-expressive *actions*—that is, adjusting the tank and placing an order for $CO_2$—not any discernible speech or expressive conduct on Romero's part. To the extent Romero tries to rely on the "$CO_2$ tank incident" as a basis for his First Amendment retaliation claim, the Court rejects this argument as meritless.

16

Turning next to the third incident—Romero ordering lime and accusing his supervisors of negligence for allowing the Plant to deplete its lime supply. This incident contains elements of both action and speech. Though Romero argues that he was fired because he ordered more lime, that is non-expressive conduct—not speech— and thus cannot provide the basis for his retaliation claim. But to the extent Romero argues that he was fired specifically because of his email criticizing his supervisors, that is speech and thus may fall within the ambit of the First Amendment.

So the Court is left with four incidents to consider in adjudicating Romero's retaliation claim: (1) Romero raising concerns with Belcher and Clemons that the Plant's operators were not properly trained; (2) Romero criticizing his supervisors for allowing the Plant's lime storage levels to be depleted; (3) Romero contacting the OEPA to discuss the 4 Log reports; and (4) Romero reminding Clemons of his obligation to send test notifications to City residents.

### 2. Some Of The Speech Was Protected Speech.

Just because the four incidents above contained some element of speech, though, does not mean that the speech necessarily receives First Amendment protection. "The First Amendment's freedom of speech is not unlimited." *United States v. Puch*, No. 3:19-cr-130, 2020 WL 905268, at *7 (S.D. Ohio Feb. 25, 2020) (collecting cases). This is particularly true where public employee speech is concerned. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Thus, while a public employee does not shed their First Amendment

17

rights just because of their government employment, the First Amendment's protection is not as robust as in other contexts. A public employee's speech receives First Amendment protection only when the employee "speak[s] as a citizen addressing matters of public concern." *Id.* at 417 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). In adopting this limitation, the Supreme Court sought to accommodate the inherent tension between affording public employees adequate First Amendment protection, but not constitutionalizing every employee grievance. *See id.* at 420.

To determine whether Romero engaged in protected speech under *Garcetti*, the Court must conduct a three-step inquiry. The first question is whether Romero spoke within the scope of his official duties. *Id.* at 417. Speech "pursuant to the employee's official duties" (i.e., "employee-speech") is unprotected. *Id.* at 413. But for speech outside that realm, or in other words, where the public employee is speaking as a citizen (i.e., "citizen-speech"), the second step asks whether the speech touches on a matter of public concern. *Id.* If not, the speech, even as citizen-speech, will not support a First Amendment claim. Finally, if Romero can clear both those hurdles—if the speech was citizen-speech (non-employee speech) *and* involved a matter of public concern—the analysis continues to a third step. There, the Court must balance the interests Romero's speech served against the City's need to promote "the efficiency of the public services it performs through its employees." *Id.* at 417 (quotation and citation omitted). A failure at any of these steps dooms Romero's claim.

18

The Court will address the three steps slightly out of order. In particular, the Court first considers which of the four incidents involves a matter of public concern. The Court starts there because several *clearly* do not fall into that category, meaning they fail as a matter of law to support a retaliation claim, whether those statements were employee speech or citizen speech. As for the incidents that arguably do involve matters of public concern, the Court will consider whether they consist of employee-speech or citizen-speech. Finally, the Court will address the balancing issue.

### a. Only Some Of Romero's Speech Addressed Matters of Public Concern.

As noted, the Court begins by considering whether any (or all) of these incidents of speech addressed matters of public concern: first, Romero raising concerns with Belcher and Clemons that the Plant's operators were not properly trained; second, Romero criticizing his supervisors for allowing the Plant to deplete its lime storage levels; third, Romero contacting the OEPA to discuss the 4 Log reports; and fourth, Romero reminding Clemons of his obligation to send test notifications to City residents.

The framework for deciding whether speech relates to a matter of public concern is "not well defined." *Snyder v. Phelps,* 562 U.S. 443, 452 (2011). Courts have established guideposts, however. "Speech involves matters of public concern when it can be fairly considered as relating to [1] any matter of political, social, or other concern to the community, or [2] when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citing *Snyder*, 562 U.S. at 453). For example, the

19

Sixth Circuit has observed that speech about illegal conduct or about threats to public health or safety is well within the scope of public concern. *Anders v. Cuevas*, 984 F.3d 1166, 1176 (6th Cir. 2021) (observing that "public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law" (citing *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986))); *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 617–18 (6th Cir. 2001) (characterizing speech "designed to increase the awareness of regulatory violations and potential threats to the public health and safety of the community" as "a perfect example of protected speech").

We can contrast such weighty matters against more banal workplace disputes that are not entitled to First Amendment protection. For example, in *Haynes v. City of Circleville*, a police officer sent a memo to his chief criticizing a plan to reduce training sessions for their department's canine patrol units. 474 F.3d 357, 359–60 (6th Cir. 2007). Although the officer conceded the plan was legal, he "speculat[ed] that someday there could be a negative incident that might result from the reduction in canine training." *Id.* at 364–65. The Sixth Circuit found the memo did not address a matter of public concern, stating that it "reflect[ed] nothing more than 'the quintessential employee beef: management has acted incompetently.'" *Id.* at 365 (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)).

In considering whether speech addresses a matter of public concern, the Sixth Circuit has also held that it is "'plainly illogical and contrary to the broader purposes of the First Amendment' to assert than 'an individual's *personal* motives for speaking

may dispositively determine whether that individual's speech addresses a matter of *public* concern.'" *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527 (6th Cir. 2015) (quoting *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997)) (emphasis original). Rather, the core distinction is "between matters of public concern and those only of private interest, not between civic-minded motives and self-serving motives." *Id.* (quoting *Mosholder v. Barnhardt*, 679 F.3d 443, 450 (6th Cir. 2012)) (internal quotation marks and modifications omitted). The Sixth Circuit also has held that, unless the employee made intentionally or recklessly false statements, the truthfulness of the employee's speech is irrelevant in determining whether it addresses a matter of public concern.[2] *Westmoreland v. Sutherland*, 662 F.3d 714, 720–21 (6th Cir. 2011).

### i. *Romero's Criticism That Plant Operators Lacked Supervision Was Not A Matter Of Public Concern.*

The first incident Romero lists as a basis for his retaliation claim is when he complained to Belcher and Clemons that the Plant's operators were not receiving proper training. As Romero explained in his Opposition, he "reported [to Belcher and Clemons] that operators were lacking management direction and training, and were unaware of fluoride, chlorine, hardness and alkalinity targets and lime feed rates." (Doc. 48, #1370–71). Why exactly Romero was concerned about the Plant operators' training (or lack thereof) is unclear from his briefing—however, he vaguely suggests

---

[2] However, "the truthfulness of [the employee's] statements may be relevant—*as one factor*— in striking the appropriate balance between the employee's right to free speech and the employer's interest in efficient administration." *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007).

that his criticism on this point related to broader concerns that "the operation of the water treatment plant and the condition of the water treatment facilities [had] deteriorated to the level where there [was] an impending risk to the public health and welfare." (*Id.* at #1386). Thus, Romero argues, his criticism that the Plant operators lacked adequate training and management was connected to broader concerns about the public's health and wellbeing.

The Court is not persuaded. Indeed, Romero's argument strikes the Court as akin to the argument the Sixth Circuit rejected in *Haynes*. Just as the police officer in that case argued that his chief's plan to reduce canine patrol training sessions might lead to a negative incident, here too Romero tries to rely on a concern that his co-workers' inadequate training eventually could affect public health. But *Haynes* explains that, without some concrete connection between the speech at issue and an impending effect on a matter of public interest (for example, a direct threat to public health or safety), concerns such as lack of training or supervision represent "nothing more than the quintessential employee beef: management has acted incompetently." 474 F.3d at 365 (citing *Barnes*, 848 F.2d at 735).

Indeed, crediting Romero's argument on this point would threaten to destroy any analytical value in this step of the *Garcetti* test. Almost all government employees, on some level, engage in work that affects public health, safety, and rule of law. By that same token, almost all government employees could argue that mismanagement on their employer's part could—if viewed abstractly enough— eventually impact these same weighty concerns. Thus, it is not merely enough to

suggest that mismanagement might lead to negative social consequences in the abstract. Instead, to prevail on this step, a plaintiff must show that the speech had a direct and concrete connection to matters of public concern. And in that regard, Romero's criticism that his co-workers lacked adequate training and supervision, without tying those concerns to a concrete and identifiable risk of impending public harm, falls short. The Court concludes that, on the facts here, Romero's complaints that his co-workers' lacked adequate training were not a matter of public concern.

### ii. Romero's Criticism Regarding Depletion of Lime Supplies Did Not Involve A Matter Of Public Concern.

Next, the Court turns to the incident where Romero criticized his supervisors for being "simply negligent" because they allowed the Plant to deplete its lime supplies.

The parties' arguments on this point largely turn on whether any laws or regulations required the Plant to maintain certain lime storage levels. Romero suggests that there was such a regulatory requirement, because "Middletown is approved as a lime-softening water treatment plant, and OEPA regulations require plant operation in compliance with that approval." (Opp'n, Doc. 48, #1371). Thus, Romero seems to argue, Defendants' failure to maintain adequate lime storage levels rendered the Plant noncompliant with the requirements of its OEPA approval, meaning Romero's criticism on this point addressed a matter of public concern. Defendants, in response, argue that there is no specific regulation requiring that the Plant maintain certain lime storage levels, and thus Romero's criticism of his

managers ultimately did not connect to any matters of public concern. (Reply, Doc. 63, #2630).

Rather than citing to the regulations themselves to support the contention that a lime storage level requirement either does or does not exist, the parties instead choose to rely on deposition testimony. For example, to support his argument that there is a lime-storage-level requirement, Romero cites portions of Mariano Haensel's and Jeff Davidson's depositions. (Doc. 48, #1371). But neither of those citations supports Romero's contention. In Davidson's deposition, for example, Davidson simply explained that treatment plants using a lime-softening process receive approval from the OEPA and must operate under an approved plan. (Doc. 30, #664–65). But Davidson does not say whether Middletown's OEPA-approved plan required that Middletown maintain some minimum lime storage level. (*See id.*). As for Haensel's deposition, the pages Romero cites do not discuss lime storage. (Doc. 29, #640–41).

Defendants, on the other hand, cite Romero's deposition to support their argument that there is no legal requirement that the plant maintain certain lime storage levels. There, Romero states that, although the "10 States Standards" require the Plant to have a thirty-day supply of lime, these are merely "best practices that [the City] adhere[s] to." (Doc. 36, #1084–85).

Thus, Romero has presented no evidence showing that a lime storage level requirement exists by law. In contrast, Defendants have presented at least some evidence—from Romero himself, no less—that, although it may be a "best practice"

for plants to maintain certain lime storage levels, there is no legal requirement that they do so. Without clear guidance from either party directing the Court to the relevant regulations, the Court thus concludes for this Motion that the Plant was not required—by regulation or statute—to maintain certain lime storage levels.

That is a problem for Romero. As already discussed, the Sixth Circuit has clearly stated that allegations of *illegal* conduct by government organizations fall within the public interest. Romero, though, has identified no equivalent case law showing that failing to adhere to best practices—rather than law—rises to the same level of public concern. In fairness to Romero, the Court can imagine an argument that a government entity's adherence to certain non-binding standards might represent a matter of public interest, if those non-binding standards are widely accepted and directly connected to concerns about public health or well-being. But allowing a plaintiff to cite "best practices" alone strikes the Court as blurring the line between genuine matters of public interest and the "quintessential employee beef" that "management has acted incompetently."

Here, Romero fails to explain what the Ten States Standards are and how their lime storage requirement ties, if at all, to public health or well-being. The Court finds that Romero's accusation that his supervisors behaved negligently in failing to maintain adequate lime storage levels was not a matter of public interest.

### iii. *Romero's Communications With The OEPA Involve A Matter Of Public Concern.*

Third, the Court considers Romero's communications with the OEPA regarding the proper calculation of the 4 Log reports. In his Opposition, Romero

argues that these communications reflected his underlying concerns about Middletown's water quality and regulatory compliance, and thus directly addressed matters of public concern. (Doc. 48, #1385). In response, Defendants do not dispute that concerns about the 4 Log reports *could* constitute matters of public interest. But they argue that the specific circumstances of Romero's communications with the OEPA—namely (1) his personal motives in making contact, and (2) the fact that his concerns were ultimately unfounded—compel the conclusion that Romero's communications did not address a matter of public concern. (Mot., Doc. 43, #1330; Reply, Doc. 63, #2629).

The Sixth Circuit has observed that speech "designed to increase the awareness of regulatory violations and potential threats to the public health and safety of the community" falls well within the public interest. *Charvat*, 246 F.3d at 617–618. For example, in *Charvat*, the Court found that the plaintiff's reports addressing concerns that his wastewater plant had violated several environmental regulations addressed matters of public interest both because it reflected underlying concerns about illegal conduct and threats to public health. *Id.*

Much like in *Charvat*, in this case, Romero contacted the OEPA to address his concerns that the plant was not operating in compliance with OEPA regulations and jeopardizing public health. In his deposition, Romero explained that the Plant submits 4 Log Report to the OEPA monthly. That report includes calculations of the plant's "contact time" values, which quantify how long the plant's water is in contact with disinfectants before being sent to the public. The contact time "value has to be

above a certain point." (Doc. 36, #1104). Thus, Romero explained, his communications with the OEPA regarding the calculations in the 4 Log report addressed under concerns "that [the Plant] might not be meeting [its] [contact time]." (*Id.* at #1109). Romero then elaborated, "[i]f you fall below [the required contact time,] then you don't have adequate … disinfection of the water[,] so you're sending out water that hasn't been adequately disinfected to the public." (*Id.* at #1110). Because Romero's testimony shows that his communications with the OEPA regarding the calculations in the 4 Log reports related directly to his concerns that the City was not adequately disinfecting its water supply, the Court concludes that these communications involved a matter of public interest.

Defendants' counterarguments on this point do not compel a different conclusion. First, Defendants argue that Romero's communications with the OEPA did not involve matters of public interest because they were motivated by Romero's personal curiosity about how the 4 Log Reports should be prepared, rather than concern for the public's well-being.

There are two problems with that argument. First, as already discussed, the Sixth Circuit has held that a speaker's motives are irrelevant in determining whether his speech addressed a matter of public interest. *Stinebaugh*, 630 F. App'x at 527. Accordingly, Defendants' reference to Romero's alleged motives fails as a matter of law.

Separately, even if Defendants *could* make that argument as a legal matter, it is not at all clear that this argument is factually borne out in the record. Defendants'

argument relies mainly on the fact that, although Romero's conversation with Davidson led him to believe that the Plant was not properly collecting its data, Romero "never told Mr. Davidson that he thought the City was not in compliance, nor did he feel it was necessary to pass along any information he received from Mr. Davidson to his supervisors other than to tell them he though[t] they were doing it wrong." (Doc. 63, #2629).

But that argument leaves out important facts. During his deposition, Romero stated that he *was* "going to pass [the information he learned] along" to his supervisors at the Plant. (Doc. 36, #1118). Before he could do so, however, he "got an e-mail from Scott so … [he] didn't pass the information along." This is because Scott "said that it wasn't [Romero's] job or concern, that he was taking care of it and he would be responsible." (*Id.*). When asked how he responded to that email, Romero states that he "said okay. It's okay to you that I thought that we were doing it wrong and that if … you want to do it wrong, I mean the essence was if you want to do it wrong I guess you're going to, you've said you're taking responsibility so it—it isn't my job." (*Id.* at #1119). Defendants appear to be arguing that Romero's failure to communicate his concerns to management shows that he wasn't concerned about the public's well-being—after they *themselves* effectively told him not to bother communicating these concerns because they would fall on deaf ears. Even if the Court could consider Romero's motives in determining whether his speech addressed a matter of public concern, this argument strikes the Court as a stretch.

28

Defendants next argue that Romero contacted the OEPA out of personal interest because there was not "truly a cause for concern that the City's 4 log calculations were incorrect …. Not only did Mr. Belcher assure [Romero] that the City was correctly conducting the 4 Log calculations, but [Romero] himself has admitted that the city was meeting its required disinfectant contact time." (Doc. 63, #2629). Again, the Court is not persuaded. Even if Romero now admits after the fact that the City was meeting its required CT time, at the time he contacted the OEPA, Romero *was* "concerned that [the City] might not be meeting [its] CT time." (Doc. 36, #1109). Unless there are allegations that Romero's communications were reckless or intentionally false, and the Court has not seen any allegations that they were, then the fact that his concerns ultimately may have proven to be unfounded is irrelevant in determining whether his communications were of public concern. *Westmoreland*, 662 F.3d at 720–21.

### iv. *Romero's Reminder About Test Notifications Involves A Matter Of Public Concern.*

Finally, the Court considers Romero's reminder to Clemons of his legal obligation to send test notifications to City residents within a 30-day window. In his Opposition, Romero obliquely refers to this reminder:

> Mr. Romero's speech and reports about the need for Middletown to comply with OEPA regulations … is constitutionally protected. *Charv[a]t v. E. Ohio Re[g]'l Wastewater Auth.*, 246 F.3d 607, 618 (6th Cir. 2001) ("the public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law."); *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002) (the proper operation of an institution that oversees some aspect of public safety is a matter of public concern).

(Doc. 48, #1386).

29

The Defendants more squarely address the point:

> [R]egarding the notifications to residents about the results of the tap water tests, Plaintiff cannot demonstrate that there was any issue or violation that would have constituted a matter of public concern. Rather, Plaintiff received one call from one resident, merely inquiring as to the results, which Clemons indicated to Plaintiff were being prepared for mailing the same day. Plaintiff admits that he had no idea when the thirty-day deadline would have passed, nor did he know whether the City violated this deadline. All Plaintiff relied upon was his suspicion, which is further undermined since, just as with Plaintiff's other concerns, the City never received any type of citation, violation, or disciplinary action from any agency.

(Doc. 43, #1329 (citations omitted)).

Romero has the better argument. As Romero correctly noted, the Sixth Circuit has held that "the public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Charvat*, 246 F.3d at 618 (citing *Marohnic v. Walker*, 800 F.2d at 616). Romero believed that "the City had already missed its thirty days and [he] notified Mr. Clemons in an e-mail that the City only had a thirty day window." (Doc. 36, #1127). He had reason to believe this because a "resident had called [Romero]. A phone call had come to [him] because [he] was involved in the lead and copper survey and they wanted to know what the results were because it had been a while." (*Id.* at #1128).

True, Defendants argue that they did not, in fact, violate the 30-day window. (Doc. 43, #1329). But that doesn't help their argument for two reasons. First, whether the City met the 30-day window seems to be disputed, as Romero maintains that a violation did occur. (Doc. 36, #1131). More fundamentally though, as the Court explained above, even if Romero's concerns may have been ultimately unfounded is irrelevant in determining whether his communications were of public concern.

30

*Westmoreland*, 662 F.3d at 720–21. As *Charvat* instructs, ensuring compliance with legal obligations is a quintessential example of a public concern. And based on a phone call he received from a frustrated citizen who had yet to receive legally mandated test results, Romero was reporting his belief that the City was not complying with its legal obligations. This reminder thus addressed a matter of public concern.

### b. Romero Engaged In Citizen-Speech As To The Statements That Involve Matters Of Public Concern.

Separately, the Court must determine whether the speech at issue is "employee-speech" or "citizen-speech," as the former, even if on a matter of public concern, does not give rise to a First Amendment claim. In arguing that Romero's speech was not made as a private citizen, the Defendants rely heavily on the Sixth Circuit's observation in *Mayhew* that "[w]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." (Reply, Doc. 63, #2625 (quoting *Mayhew v. Town of Smyrna*, 856 F.3d 456, 465 (6th Cir. 2017))). Thus, the Defendants argue, if an employee's speech was (1) made "up the chain of command" and (2) concerned the employee's job duties, then there can be little debate that this speech was not made as a private citizen.

The Court agrees that Defendants have correctly quoted *Mayhew*, and that this is an accurate statement of the law in this Circuit. Nor is there any genuine dispute here that at least a portion of Romero's speech at issue was made "up the chain of command" at his workplace, including emails to Belcher and Clemons, his superiors.

31

The tougher question is the second element: whether Romero's speech was "about his job duties." The Sixth Circuit has acknowledged that "[d]etermining whether an employee speaks as a private citizen or as a public employee can be challenging," and there is no "comprehensive framework for defining the scope of an employee's duties." *Mayhew*, 856 F.3d at 464. At the same time, though, the Sixth Circuit has offered some important guidance. In particular, it has emphasized that the inquiry is not simply whether the speech relates to the employee's job duties in some abstract sense, for example, "because it concerns information acquired by virtue of the speaker's public employment." *Mayhew*, 856 F.3d at 463 (quoting *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015)). Rather, the inquiry is a "practical" one, in which the Court must consider "whether the speech at issue is itself *ordinarily* within the scope of an employee's duties." *Id.* (emphasis added). To assist in that endeavor, the Sixth Circuit also has identified several factors to consider including: (1) the impetus for the speech; (2) the setting of the speech; (3) the speech's audience; and (4) the general subject matter ("*Weisbarth* factors"). *See Aquilina v. Wriggelsworth*, 759 F. App'x 340, 344 (6th Cir. 2018) (citing *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540–41 (6th Cir. 2007)).

Two incidents remain at issue: first, Romero contacting the OEPA to discuss the 4 Log reports; and second, Romero reminding Clemons of his obligation to send test notifications to city residents.

Neither of these incidents strikes the Court as falling within Romero's ordinary job responsibilities as an Assistant Lab Analyst. Indeed, Defendants argue as much

throughout their briefing. First, as to Romero's communications with the OEPA to discuss how the data in the 4 Log reports should be calculated, Defendants state that "the completion of the 4 Log reports was not part of [Romero's] job responsibilities." (Mot., Doc 43, #1320; *see also* Reply, Doc. 63, #2636 ("[T]opics such as 4 Log reports that had nothing to do with Plaintiff's job responsibilities.")). Similarly, about Romero reminding Clemons of his obligation to send test notifications to City residents, Defendants state that Romero "had no knowledge as to when the [test] results were received or who received them, and he was not responsible for issuing notices [to residents] regarding the results." (Doc. 43, #1319).

Thus, by Defendants' own admission, Romero's speech at issue was not connected to his responsibilities as an assistant lab analyst. Indeed, Defendants are relying on that fact to support their case that Romero's speech undermined the treatment plant's efficiency—the third prong of the *Pickering* test. And Defendants have the right to make that argument, just as they may argue that Romero's speech was non-private because it related to his ad hoc job duties. But as the Court stated in its Order denying Defendants' Motion to Dismiss, "Defendants cannot have it both ways—disciplining Romero because his speech 'exceeded the scope of his job duties,' but now defending against his claim for retaliatory discharge by asserting that the speech in fact fell within those job duties." (Doc. 21, #203).

That said, and Defendants' own admissions on this issue notwithstanding, Defendants offer several counterarguments to support their point that Romero's speech was—in fact—part of his job responsibilities. The Court finds none persuasive.

Defendants first argue that Romero's speech arose from his job responsibilities as it related to information he gained while "traversing the water treatment plant, which … [Romero] was required to do" as an Assistant Lab Analyst. (Doc. 63, #2626 (internal quotation marks and modifications omitted)). But as the Supreme Court observed in *Lane v. Franks*, "[t]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question … is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 573 U.S. 228, 240 (2014). Here, while Defendants argue that Romero's speech concerned information he learned while traversing the plant, they expressly disclaim, as already noted, that the speech itself fell within his job duties. So the Court rejects this argument.

Second, Defendants argue that Romero's speech was employee-speech because his job description required that he "[c]ommunicate clearly, both verbally and in writing, for plant interaction, customer service, and water quality concerns." (Doc. 63, #2626 (citing Doc. 36, #1256)). Again, the Court finds Defendants' argument impossible to reconcile with Supreme Court precedent. In *Garcetti v. Ceballos*, the Court

> reject[ed] the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

34

547 U.S. 410, 424–25 (2006) (internal citations omitted). Here, the Defendants' argument that Romero's speech fell within his job duties because his job description required him to "communicate … water quality concerns" strikes the Court as exactly the "excessively broad job description" *Garcetti* prohibits this Court from crediting. For that reason, the Court rejects as meritless Defendants' contention that Romero's speech was non-private because of his job description.

Finally, Defendants argue that Romero's speech related to his employment duties, because, if he had concerns about the plant's operations, he had an "ad hoc" or "de facto" responsibility to communicate these concerns to his supervisors. (Doc. 63, #2626–27). The Defendants made a similar argument at the motion-to-dismiss stage, when the Court rejected it, relying mainly on the Sixth Circuit's *Handy-Clay v. City of Memphis*, 695 F.3d 531 (6th Cir. 2012). In that case, the defendant-municipality fired the plaintiff—its public records coordinator—after she reported concerns within and outside her chain of command that government funds were being misused and employee attendance records were being falsified. *Id.* at 542. The Sixth Circuit declined to dismiss the plaintiff's First Amendment retaliation claim, observing that she had never been asked to investigate the violations she reported and that nothing in the facts as alleged "suggest[ed] that the duties of her position as public records coordinator included reporting on government corruption and mismanagement of public funds." *Id.* at 542–43. Thus, the communications were "extraordinary rather than everyday communication," and not within the scope of the

plaintiff's job duties. *Id.* at 542 (quoting *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010)). That language seems to apply equally here.

For these reasons, the Court finds the two incidents of Romero's speech at issue were non-private in nature.

### c. Balancing Romero's Interests Against The State's Interests.

The final step in determining whether Romero engaged in protected speech requires the Court to determine whether Romero's "interest in commenting upon matters of public concern outweighs the interest of [the City], as an employer, in promoting the efficiency of the public services it provides through its employees." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 537 (6th Cir. 2020) (modifications omitted). This is often called the *Pickering* balancing test. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

In applying the *Pickering* test, the Sixth Circuit has observed that "it is appropriate to begin [the] analysis by determining the degree of protection the speech warrants, *i.e.*, the level of importance the speech has in the community." *Bennett*, 977 F.3d at 538. For example, in *Bennett,* the plaintiff—a former Emergency Telecommunicator employed by a city police department—was fired after she posted a racial slur on her public social media page in a post celebrating Donald Trump's victory in the 2016 presidential election. *Id.* at 533–34. While the Sixth Circuit concluded this post enjoyed some First Amendment protection, the post did not occupy "the 'highest rung' of protected speech." *Id.* at 538. In reaching that holding, the Sixth Circuit contrasted the plaintiff's post from instances where government

36

employees might speak on issues on which they have special insight. *Id.* at 539. Whereas the latter category of speech arguably would enjoy more protection, the Sixth Circuit found that the public had little interest in the plaintiff's specific speech—a racial slur included in an otherwise generic political post celebrating a candidate's victory. *Id.*

After determining the weight of protection to which speech is entitled, the Court must then conduct a holistic analysis to assess the weight of the state's countervailing interest. As the Sixth Circuit has explained, "pertinent considerations" include:

> whether the statement [1] impairs discipline by superiors or harmony among co-workers, [2] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, [3] impedes the performances of the speaker's duties or interferes with the regular operation of the enterprise, or [4] undermines the mission of the employer.

*Id.* at 539–40 (cleaned up). Returning to *Bennett* as an example, the Sixth Circuit held that the plaintiff's social media post substantially implicated the City's interest in providing efficient government services. In reaching that conclusion, the Court observed that office harmony was significantly disrupted in the wake of the plaintiff's post, with employees engaging in a "nonstop conversation" that required management to bring in a counselor. *Id.* at 540. Moreover, several employees reportedly had concerns about working effectively with the plaintiff after the incident, showing that the post had jeopardized the close working relationships needed among the department's Emergency Telecommunicators. *Id.* at 540–41. Also importantly, the Court recognized that the Emergency Telecommunications

department was a vital link between the City's citizens and first responders, and the plaintiff's post threatened to create a perception of bias among the public that would have undermined that role. *Id.* at 541. Considering all these factors, combined with the fact that the plaintiff's speech did not occupy "the highest rung" of public concern, the Sixth Circuit found that the *Pickering* test favored the public employer, and thus the plaintiff's termination did not violate the First Amendment. *Id.* at 545.

Here, Defendants argue that Romero's speech undermined the City's delivery of public service in multiple ways. They argue that Romero: (1) undermined Plant morale—as well as Belcher and Clemons' authority—by telling them he did not feel operators were being managed correctly, (Mot., Doc. 43, #1331); (2) caused confusion by taking unilateral corrective steps when he encountered perceived problems in the Plant (for example, by placing an order for additional lime), (Reply, Doc. 63, #2634); (3) wasted City resources by contacting the OEPA on the City's time using the City's equipment, (Doc. 43, #1331–32); and (4) undermined Belcher and Clemons' authority and "caus[ed] chaos" by "repeatedly going around management to directly contact the OEPA regarding minor topics and questions." (*Id.*).

The Court can eliminate from consideration the first and second issues Defendants have identified, as they to relate to speech or conduct by Romero that the Court has already concluded are not protected. That still leaves, however, Defendants' arguments that Romero's communications with the OEPA wasted city resources and undermined Belcher and Clemons' authority. The Court addresses each of these arguments below.

### i.    Did Romero Waste City Resources?

First, Defendants argue that Romero's speech undermined the effective delivery of government services by wasting city resources. As Defendants contend, Romero "contacted the OEPA on the City's time, using the City's equipment and resources, while he was supposed to be performing his duties as an Assistant Lab Analyst." (Doc. 43, #1332). Thus, "any possible interest [Romero] ha[d] in seeking miscellaneous guidance from the OEPA, at the expense of his actual, official job duties, does not outweigh the City's interest in … ensuring the appropriate and efficient use of its time and resources." (*Id.*).

In analyzing this argument, the Court must first determine what "rung" of public concern Romero's speech occupies. As the Sixth Circuit has explained, "[c]entral to the concept of protecting the speech of government employees is the idea the public employees are the most likely to be informed of the operations of public employers and that the operation of such entities is 'of substantial concern to the public.'" *Bennett*, 977 F.3d at 539 (quoting *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007)). For example, in *Bennett*, the Sixth Circuit found the plaintiff's speech was of little public interest, because her speech was essentially generic and offered no special insight informed by her role as a government employee. In contrast, Romero's communications with the OEPA addressed a matter of substantial public interest in that they were related to regulatory compliance and the safety of the water supply. And, as he is an expert in this field with significant experience, the public had a strong interest in Romero's speech on this matter. Thus, the Court concludes that Romero's communications with the OEPA occupy a high rung of public concern.

39

Unlike the strong weight afforded to Romero's speech, Defendants' argument that Romero undermined the City's ability to deliver public services by wasting government resources is weak. Indeed, to the extent Defendants argue that Romero wasted City resources by using the City's computers, email network, and phones to contact the OEPA, this alleged "waste" would appear to be minimal at best. Moreover, although Defendants argue that Romero wasted City time by focusing on matters beyond his job's responsibilities, they have not pointed to any examples of how the City suffered as a result. Particularly given the substantial weight afforded to Romero's speech, Defendants' failure to point to any concrete examples of how his alleged misuse of public resources impacted the City's interests strikes the Court as problematic for Defendants' argument.

### ii. Did Romero Undermine Belcher And Clemons' Authority?

Defendants also argue that Romero's communications with the OEPA impeded the City's ability to deliver government resources because it risked "undermining Clemons' and Belcher's authority and ... 'causing chaos' by repeatedly going around management to directly contact the OEPA regarding minor topics and questions." (Doc. 43, #1331).

The Court struggles to follow Defendants' argument on this point. They cite *Holbrook v. Dumas*, 658 F. App'x 280, 289 (6th Cir. 2016) (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)), to argue that "[t]he limited First Amendment interest involved here does not require that [employers] tolerate actions which [they] reasonably believed would ... undermine [their] authority." (Doc. 43, #1331). But

40

surely a valid exercise of First Amendment rights addressing an issue of public concern would *also* undermine their authority? The question is not whether their authority is undermined, but whether the First Amendment interest is too limited to justify that undermining.

The interest in *Holbrook* was less substantial than here. Holbrook, the Fire Chief of Lincoln Heights, was concerned by news that the village was losing its liability insurance, and the potential impact that could have on his employee's jobs. *Holbrook*, 658 F. App'x at 281–82. Those are not unimportant interests. But as the Court has noted, Romero's concerns, including water quality, public safety, and the proper respect for legal obligations, represent what the Sixth Circuit has found the "zenith" of public interest. *Charvat*, 246 F.3d at 618. And government employees are uniquely situated to make observations about those interests. *See Bennett*, 977 F.3d at 539. When reporting concerns about those interests, employees may well undermine superiors. But to protect their First Amendment rights to speak about those most important interests, courts will have to tolerate those side-effects.

### 3. A Reasonable Jury Could Find That Romero's Speech Was a Motivating Factor in His Firing.

"In order to establish a causal connection between the protected conduct and the adverse action, plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity." *Dye*, 702 F.3d at 305 (quoting *Eckerman*, 636 F.3d at 209). "A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between

engaging in protected activity and suffering an adverse employment action that may create an inference of causation." *Id.*

In his Opposition, Romero argues that his speech was a motivating factor in his firing. He says that:

> Middletown feared that if Mr. Romero continued to speak out about the water treatment plant, Middletown would be exposed to public scorn and ridicule. Middletown's conduct in acting on these fears by retaliating against Mr. Romero is direct evidence that Mr. Romero's termination for "insubordination" (i.e. his refusal to promise not to talk) was motivated by his protected speech.

(Doc. 48, #1387) (citing *Kesterson v. Kent State Univ.*, No. 5:16-cv-298, 2017 U.S. Dist. Lexis 37186, at *37 (N.D. Ohio Mar. 15, 2017), and *Pesek v. Brunswick*, 794 F. Supp. 768, 786–87 (N.D. Ohio 1992)). That argument strikes the Court as largely circular in the absence of any outside evidence to support the alleged fears that Romero outlines above.

But Romero offers another more compelling argument:

> There is also temporal proximity between Mr. Romero's contact with the OEPA (raising the specter of the 2016 OEPA citation), Mr. Clemons' late lead notices (an OEPA violation), the August 4 meeting (where Mr. Romero was interrogated about his OEPA contacts), and the August 15, September 29, and October 13 meetings (all focused on pressuring Mr. Romero to promise his silence) present an inference of causation.

(*Id.* (citing *Dye*, 702 F.3d at 305)).

And perhaps the best argument for Romero's position inadvertently comes from the Defendants. They argue that Romero was fired not because of his concerns about compliance or violations (which they say they urged him to report), but because he refused to "accept[] management's directive to only focus on his specific duties and

42

responsibilities." (Doc. 43, #1333 (quoting Doc. 36, #992) (internal quotation marks omitted)). But as the Court noted earlier, the Defendants themselves argue (at least sometimes) that many of Romero's concerns, like 4 Log reports and test notifications, lay outside his job responsibilities. *See supra*. Some of these concerns, like test notifications, implicate interests such as compliance with the law, which represent the "zenith" of public interests. *Charvat*, 246 F.3d at 618. So in speaking about these interests, Romero was necessarily concerning himself with things outside his job description. That is, the two items—(1) speaking on these issues and (2) concerning himself with things outside his job description—were inextricably linked. Firing him for the latter thus could be seen as tantamount to firing him for the former. At the very least, the temporal connection between the two could lead a jury to a causal inference that, despite superficially encouraging him to report violations, his superiors did not want him causing trouble, and ultimately fired him for voicing his concerns.

## B. The Defendants Do Not Show by a Preponderance of the Evidence that They Would Have Fired Romero Absent His Speech

Once the plaintiff establishes a prima facie case, "the burden shifts to the defendants, who must show by a preponderance of the evidence that 'the employment decision would have been the same absent the protected conduct.'" *Dye*, 702 F.3d at 307 (citing *Eckerman*, 636 F.3d at 208) (internal quotation marks omitted).

Defendants say that they fired Romero due to his insubordination, not his speech. (Doc. 43, #1333). Despite several meetings where his supervisors warned him otherwise, Romero "continued to expressly indicate that he would not comply with

their directive that he focus only on his own job duties." (*Id.*). Defendants argue that "[t]his failure to abide by Defendants' directives clearly demonstrates that Plaintiff's termination would have occurred regardless of any speech that he engaged in." (*Id.*).

Again, this simply is not true by their own admissions. Yes, they told Romero that he "had every right to contact the Ohio EPA to report a violation or something he feels is not in compliance." (Doc. 63, #2636). But they *immediately* followed by warning him to "not call the Ohio EPA for miscellaneous questions about topics such as 4 Log reports that had nothing to do with Plaintiff's job responsibilities." (*Id.*). Notably, many of his concerns related to public safety and compliance had nothing to do with his job. Thus, as the Court explained above, the two are linked. He could not speak on his concerns about public safety and compliance, protected by *Charvat*, without violating the order that he only focus on his specific duties and responsibilities. (*See* Doc. 43, #1333). Defendant do not show by a preponderance of the evidence that they would have fired Romero even absent his speech.

At bottom, Romero has created a jury issue on the question of whether the City fired him in retaliation for engaging in protected speech.

## C.     The Individual Defendants are Not Entitled to Qualified Immunity

That still leaves the question of qualified immunity. The Court begins its analysis of that issue by rehashing much of what the Court said at the pleadings stage. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person should have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity protects the individual defendants, the Court asks two questions: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538–39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

The Court previously concluded, at the pleadings stage, that the individual defendants were not entitled to qualified immunity, though it left the door open to revisit the topic after discovery. (Doc. 21, #210–11). The Court now concludes that discovery has changed nothing.

Question one has been answered over the many pages above. At the summary judgment stage, viewing the facts in the light most favorable to Romero, he's shown that a constitutional violation has occurred.

That leaves the second question, which also favors Romero. "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). This general rule has been specifically established in very similar circumstances. Consider, for example, the case to which the Court often turned in discussing the potential violation here, *Charvat*. In *Charvat*, the Sixth Circuit held that qualified immunity did not protect a wastewater facility who fired a plaintiff after he reported violations of environmental regulations.

246 F.3d at 609. No matter how broadly or how narrowly you construe "clearly established," Romero's right to speak fell within its meaning.

Defendants disagree. They say that "public employees do not have a clearly established right to engage in speech that impedes the governmental employer's ability to fulfill its duties and functions." (Doc. 43, #1334 (citing *Leslie v. Ohio Dept. of Dev.*, 869 N.E.2d 687, 700–01 (Ohio Ct. App. 2007)). This is true. But they have yet to offer any evidence that Romero impeded the government's ability to fulfill its duties, as the Court concluded above.

Meanwhile, as the Defendants themselves admit (Doc. 43, #1335), "the greater the speech's relationship to a matter of public concern and the more minimal the effect on office efficiency[,] the more likely a reasonable person would be to understand that the employer's actions violated the Constitution." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006) (citing *Williams v. Kentucky*, 24 F.3d 1526, 1537 (6th Cir. 1994)). Here, Defendants have offered no evidence that Romero impeded office efficiency. And, at the risk of undue repetition, public safety and compliance with the law represent matters of the highest public concern. So the Defendants are not entitled to qualified immunity.

## CONCLUSION

Drawing all inferences in his favor, Romero can make a prima facie case for his First Amendment retaliation claim, which the Defendants have not rebutted. Meanwhile, the Defendants are not entitled to qualified immunity. So the Court **DENIES** the Defendants' Motion for Summary Judgment. (Doc. 43).

**SO ORDERED.**

February 27, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**